**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NINA BURLEIGH,<br>FREQUENCY FORWARD<br><br>Plaintiffs,<br><br>FEDERAL COMMUNICATIONS COMMISSION<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 25-1268 (ABJ)<br>)<br>)<br>)<br>) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Arthur V. Belendiuk
D.C. Bar No. 336768
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W., #301
Washington, D.C. 20016
(202) 363-4559

Dated: August 25, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ………………………………………………...……………….. ii

PRELIMINARY STATEMENT…………………………………………………...….……..1

BACKGROUND………………………………………………………………………...…….2

STATEMENT OF FACTS……………………………………………………………...……4

JURISDICTION……………………………………………………………………..………9

LEGAL STANDARD………………………………………………………………..………9

ARGUMENT………………………………………………………………………......…10

    I. Plaintiffs are Likely to Succeed on the Merits…………………………..………10

    II. Plaintiffs Will Suffer Irreparable Injury Absent the Preliminary Injunction ….12

    III. The Balance of Equities and Public Interest Favor Granting
       a Preliminary Injunction………………………………………………………14

CONCLUSION………………………………………………………………………......…16

# TABLE OF AUTHORITIES

**Cases**

*Al-Fayed v. C.I.A.*, 254 F.3d 300, (D.C. Cir.2001)……………………………….…………….9

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32 (D.D.C. 2020)……11

*Am. Oversight v. United States Dep't of State 414 F. Supp. 3d 182 (D.D.C. 2019)*………10, 11

*Brennan Ctr. for Just. at NYU Sch. of Law v. Dep't of Com.*, 498 F. Supp. 3d 87, 99 (D.D.C. 2020)…………………………………………………………………………..11, 15

*Ctr. for Pub. Integrity v. U.S. Dep't of Defense*, 411 F. Supp. 3d 5,  (D.D.C. 2019)……...11, 15

*Ctr. to Prevent Handgun Violence v. U.S. Dep't of the Treasury*, 49 F. Supp. 2d 3, 5 (D.D.C. 1999)………………………………………………….……………...15

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)…… ..9, 10, 13

*CREW v. FEC*, 711 F.3d 180, 404 U.S. App. D.C. 275 (D.C. Cir. 2013)………………………10

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, (D.D.C. 2017)…………………………………………………………………………..14

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 416 F.Supp. 2d 30 (D.D.C. 2006)……………9, 11

*Heritage Found. v. U.S. Dep't of State*, 2024 U.S. Dist. LEXIS 196584………………………13

*Heritage Found. v. U.S. EPA*, 2023 U.S. Dist. LEXIS 66153……………………………13,14

*In the Matter of Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion* GN Docket No. 25-223, FCC 25-46, 2025 FCC LEXIS 1646 (2025)………………………12, 13

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977)……………………...15

*Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005)……..11

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)………………………13

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)……………….……11

*Nken v. Holder*, 556 U.S. 418, 435(2009)……………………………………………………15

*Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)…………………12

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, (1989)..................15

*Wash. Post v. U.S. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, (D.D.C. 2006)............9, 11,15

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)...........................................15

*Winters v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)......................10, 15

**Statutes**

5 U.S.C. 552...........................................................................................1, 9, 10

18 U.S.C. § 208.............................................................................................8

47 U.S.C. §154(b).......................................................................................7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NINA BURLEIGH,<br>FREQUENCY FORWARD<br><br>    Plaintiffs,<br><br>FEDERAL COMMUNICATIONS COMMISSION<br><br>    Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 25-1268 (ABJ)<br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

1. Plaintiffs, Nina Burleigh and Frequency Forward, respectfully submits this memorandum of points and authorities in support of its Motion for a Preliminary Injunction ("Motion").

### PRELIMINARY STATEMENT

2. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the expedited processing and release of agency records concerning "Department of Government Efficiency," also known as the U.S. DOGE Service ("DOGE" or "USDS") activities within the Federal Communications Commission ("FCC"). The FCC has acknowledged that the requested information fits squarely within the narrow category for which Congress has mandated expedited processing and, on March 4, 2025, granted the Plaintiffs' request for such expeditious treatment. Nonetheless, in clear violation of the FOIA, the FCC has failed to timely process the Plaintiffs' request. The evidence suggests that the FCC will not fully process Plaintiffs' request until it is ordered to do so by this Court.

3. As demonstrated below, Defendant's continuing delay in processing the Plaintiffs' request clearly violates the law. Because time is at the essence of the Plaintiffs' rights and the agency's obligations, and because the information at issue concerns a matter of substantial and uncontested public interest, the Plaintiffs seeks the Court's expedited consideration of this matter and entry of an order compelling the FCC to process the Plaintiffs' request by no later than October 10, 2025.

## BACKGROUND

4. On November 13, 2024, President-elect Donald Trump announced the formation of DOGE.[1] Trump identified Elon Musk and Vivek Ramaswamy as the incoming leaders of the new department. Id. Shortly thereafter, Musk and Ramaswamy published an opinion piece in the *Wall Street Journal*, in which, inter alia, they declared that DOGE would operate through "embedded appointees" at federal agencies. USDS commenced operations prior to President Trump's inauguration on January 20, 2025.[2] For example, according to the *Washington Post* article, Musk had 50 staffers working out of the Washington DC offices of SpaceX, prior to the inauguration. Musk is the single majority shareholder of Space Exploration Holdings, LLC ("SpaceX"), which owns and operates Starlink, an FCC regulated satellite communications company. From January 20, 2025, until Musk's departure from DOGE on May 30, 2025, the

---

[1] Colleen Long & Jill Colvin, *Trump says Musk, Ramaswamy will form outside group to advise White House on government efficiency*, AP News (Nov. 12, 2024), https://apnews.com/article/donald-trump-president-elon-musk-vivek-ramaswamy-2f0f76bb6440231f2504b77cb117d988.

[2] See e.g. Doge is Dispatching Agents Across the US Government (Jan. 10, 2025) https://www.washingtonpost.com/business/2025/01/10/musk-ramaswamy-doge-federal-agencies/

FCC, headed by Chairman Brendan Carr,[3] acted favorably on several Starlink initiatives. For example, during this period, the FCC has opened an investigation against SpaceX competitor EchoStar, which holds satellite licenses coveted by SpaceX.[4] Further, the FCC approved a waiver for SpaceX to provide satellite service directly from orbit to smartphones, over the objection of cell network providers who say this move will worsen mobile network service for many. Id. The Plaintiffs seek information concerning DOGE's activities within the FCC and especially documents concerning FCC contacts with Elon Musk, SpaceX, Starlink or other entities associated with Musk and his various enterprises.

5. DOGE's operations within the FCC are at the heart of a debate concerning potential conflicts of interest between, Elon Musk and DOGE as regulators of the FCC, and Elon Musk's SpaceX, including Starlink, as a regulated entity seeking licenses and other accommodations from the agency. A preliminary injunction is necessary because "the requested documents are time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost.'" *Heritage Found. v. United States Dep't of State*, Civil Action No. 24-2862 (TJK), 2024 U.S. Dist. LEXIS 196584, at *4 (D.D.C. Oct. 29, 2024).

6. Plaintiffs are likely to succeed in their demand for production. Plaintiffs, who are in the business of disseminating information to the public, and the public itself, will suffer irreparable injury absent an injunction. The public interest and balance of the equities weigh in favor of the

---

[3] Brendan Carr wrote a chapter on the FCC and telecommunication for Project 2025, the Heritage Foundation's blueprint for the Trump administration.
https://www.cbsnews.com/news/trump-fcc-brendan-carr-project-2025-what-to-know/

[4] SPECIAL INTERESTS OVER THE PUBLIC INTEREST: ELON MUSK'S 130 DAYS IN THE TRUMP ADMINISTRATION
https://www.warren.senate.gov/imo/media/doc/130_days_of_elon_musk_report.pdf

requested relief. This Court should therefore issue a preliminary injunction requiring Defendant

to fully process and produce all non-exempt records responsive to its FOIA request no later than

October 10, 2025.

## STATEMENT OF FACTS

7. On February 24, 2025, Plaintiffs filed a FOIA request with the FCC which, included an

application for expedited processing. ECF No. 1 at 12–18. On March 4, 2025, the FCC granted

Plaintiffs' application, agreeing with Plaintiffs that there is a compelling need for expedited

processing. ECF No. 1 at 20-21. On April 24, having heard nothing further from the FCC,

Plaintiffs filed a FOIA Complaint with this Court. ECF No. 1. The FCC's reply to Plaintiffs'

Complaint was due June 6, 2025. On June 3 ,2025, Defendant filed a Motion for Extension of

Time seeking until July 9, 2025, to file a response to Plaintiffs' Complaint. ECF No. 6. On June

4, 2025, Plaintiffs filed an Opposition to Defendant's Motion. ECF No. 7. Defendants filed a

Reply on June 4, 2025, in which the Defendant, stated that "the primary reason for the extension

request is to allow the parties to confer about narrowing the request." Id. On June 5, 2025, the

Court issued an Order, which inter alia, required the parties to "meet and confer in an effort to

narrow the scope of plaintiff's request and prioritize the categories of documents to be

produced." On June 12, 2025, the FCC sent a letter proposing to narrow the scope of the FOIA

request. The parties met on June 13, 2025, to discuss limiting the scope of the FOIA request. As

set forth in the Joint Status Report, Plaintiffs made several concessions. ECF No. 9.

8. On July 2, 2025, the court issued a Minute Order, which stated in pertinent part,

"Defendant must file a dispositive motion or, in the alternative, a report setting forth the schedule

for the completion of its production of documents to plaintiff, on or before July 23, 2025." On

July 23, 2025, Defendant filed a Status Report (ECF No. 11) in which it neither provided a

schedule for compliance nor filed a dispositive motion. Instead, it claimed that it needed an additional three months, until October 23, 2025, to provide another status report. The FCC did state that it was "finalizing an initial production of records and anticipates that production occurring within the next three weeks."

9. On August 13, 2025, the FCC produced 35 pages of records. Exhibit 1 hereto. For six months the FCC has failed to provide even the most easily accessible records, such as the resumes of DOGE employees (to include detailees and volunteers), Declarations for Federal Employment and any relevant Financial Interests Certifications. These types of records involve almost no administrative burden and are regularly produced by Federal agencies within weeks of a FOIA request. The records the FCC has produced to date are incomplete and intentionally misleading.

10. The three known DOGE employees detailed to the FCC that were disclosed in the 35 pages of records are Jordan Wick, a software engineer; Jacob Altik, an attorney; and Tarak Makecha, allegedly also a software engineer. For Jordan Wick, the FCC provided (1) a letter offering his voluntary services (Ex 1 Bates 023), (2) a Declaration for Federal Employment (Ex 1 Bates 017), (3) a financial Interest Certification (Ex 1 Bates 020), (4) a Memorandum of Agreement for Detail between The Office of Personnel Management and the Federal Communications Commission (Ex 1 Bates 025 – 028), and (5) a resume (Ex 1 Bates 029). For Jacob Altik, the FCC produced only his resume (Ex 1 Bates 02). For Tarak Makecha, the FCC provided (1) a letter offering his voluntary services (Ex 1 Bates 01), (2) a Declaration of Federal Employment (Ex Bates 030 – 032), and (3) a Financial Interests Certification (Ex 1 Bates 035). Makecha's resume was not included. This begs the question of why the FCC did not produce all records concerning the intake of the three DOGE employees. Further, all three indicated they had

5

financial interests including in regulated technology or telecom businesses on the FCC ethics

disclosure -- but all recusals, recusal guidance, or direction to divest stocks or other financial

interests were redacted or not provided.

11. The case of Tarak Makecha is instructive. On a form letter, Makecha is listed as a

"Software Engineer." See Ex Bates 01. While detailed to the FCC, Makecha was simultaneously

working at the Federal Bureau of Investigation ("FBI") and the Department of Justice ("DOJ").[5]

At the FBI, the records show Makecha was a "senior advisor" to the agency's executive assistant

director for human resources. Id. At DOJ, Makecha's work focused in part on the department's

grant-making operations. Id. Makecha has reportedly worked for DOGE at other federal

agencies, including the State Department, and the Office of Personnel Management. Id. In his

letter offering voluntary service to the FCC, Makecha claims he works for the Office of

Personnel Management. Ex 1 Bates 01. His background is in finance, not software engineering.

According to his LinkedIn profile he is a graduate of the London School of Economics and the

Texas McCombs School of Business. [6]  In 2018 to 2019 he worked for Tesla alternatively as

Global Finance Lead; Chief of Staff, North America Sales & Delivery; and Head of Strategic

Planning. At Flexport, he was Global Head of Economic Research and Business Development.

Until January 2025, he was SkySafe's Chief Financial Officer. Makecha LinkedIn profile states

that he is currently working as a vice president at Valor Equity Partners. Yet, as of the date of

this Memorandum, he is still listed in the FCC directory as an employee with an FCC email

---

[5]Shawn Musgrave, "*DOGE Installs a Fromer Tesla Employee at the FBI*" *The Intercept,* (April 18, 2025.  https://theintercept.com/2025/04/18/doge-tesla-employee-justice-department-fbi/?fbclid=IwY2xjawMUNdZleHRuA2FlbQIxMQBicmlkETFHajF6VHVISU1jWGMwUG5JAR7NBDt8ofVXTwfdQ9XQ-0PwnmJ2AyBkLSWuhRth47h0Z9i0BxbcfhuRs3j55Q_aem_HW-8x-tZz9ErknTikUp6Rg

[6] https://www.linkedin.com/in/tarakmakecha/

address.[7] Valor has a close relationship with Elon Musk and his companies. It sells shares to investors in Musk's private companies – particularly SpaceX, xAI, Neurallink, and The Boring Company.[8] Simply stated, whatever his skill set, Makecha is much more than a software engineer. However, as noted above, no resume, curriculum vitae, or any similar background information was provided by the Commission for Makecha even though that is required as part of the onboarding and clearance process.

   12. The Commission also failed to provide a copy of any of Makecha's financial disclosures, even though a copy of his February 28, 2025, Public Financial Disclosure Report (OGE-278e) filed in connection with his employment at the Office of Personnel Management is publicly available online.[9] That Office of Government Ethics disclosure shows that Makecha, as of March 20, 2025, owned between $50,000 and $100,000 in Tesla stock.  The disclosure also shows that he owned several communications sector specific mutual funds, including the Communications Services Select Sector SPDR (XLC) and the Fidelity Telecommunications Portfolio (FSTCX).  Section 4(b) of the Communications Act, as amended, prohibits FCC employees from being invested in any company or other entity that is subject to regulation by the Commission.[10]  There is no *de minimis* exception to this rule, which bars FCC staff from owning

---

[7] https://www.fcc.gov/about-fcc/finding-people-fcc?name=Tarak+Makecha

[8] Susan Pullman, Corrie Driebusch & Becky Peterson, "*A Side Hustle for Friends of Musk: Selling Access to Stakes in His Private Companies*" *The Wall Street Journal* (April 24, 2025) https://www.wsj.com/business/elon-musk-friends-private-company-access-eb93ba05?mod=Searchresults_pos7&page=1

[9] See Executive Branch Personnel, Public Financial Disclosure Report (OGE 278e) for Tarak N. Makecha (filed Mar. 20, 2025), available at https://www.documentcloud.org/documents/25950476-makecha-tarak-n-od-new-entrant-278-2025-2025-03-20/?mode=document

[10] 47 U.S.C. §154(b). See also, Section (4)(b)(2)(A)(iii) & (iv) which specifically prohibits any member of the FCC from being "financially interested in any company or other entity which controls any company or other entity specified in clause (i) or clause (ii)"  (a telecom company),

even a single share in such an entity or a mutual fund that is telecom-sector specific. Because of the Commission's failure to provide any information regarding his financial holding or recusals, it is impossible for Plaintiffs to know whether Makecha was in compliance with the statutory provision prohibiting ownership of stock in the parent company of Starlink during his period of work at the Commission.

13. Furthermore, the Commission heavily redacted almost all pertinent information regarding Makecha's access to Commission IT systems and databases – including any potential or proposed restrictions because of his past work for Tesla or Musk's subsidiaries such as Starlink. Pursuant to FCC policy, which is outlined in an official FCC Directive, the Commission's Security Operations Center (SOC) is responsible for adjudicating an "individual's employment suitability or fitness."[11] The Directive further provides that "[e]very appointment or position, including those held by contractors, is subject to investigation processing and a suitability or fitness determination" during the onboarding process. In a March 18, 2025 email, an employee in the SOC stated that "Tarak Makecha's preliminary adjudication has been approved, and the new hire can start working at the FCC." Ex 1 Bates 13 and 15. But the rest of the document is redacted, including what may be restrictions on the work he can perform or access to certain Commission information based on ethics conflicts or other suitability issues.

---

or "stocks, bonds, or other securities of, any person significantly regulated by the Commission." Section (4)(b)(2)(A)(iii) & (iv) prohibits Makecha from working for the FCC if he also owns Tesla stock. See also, 18 U.S.C. § 208 that prohibits executive branch employees from participating personally and substantially in any government matter that will affect their own financial interests or the financial interests of specific individuals they are connected to outside of the government.

[11] FCC Directive FCCINST 1133.3, FCC Personnel Security and Security Program (effective Sept. 14, 2018), available at https://www.fcc.gov/sites/default/files/fcc-directive-1135.3.pdf

14. The central thrust of Plaintiffs' FOIA request is an attempt to discover if Musk exercised any undue influence over the operations of the FCC to the advantage of his companies. The placement of Tarak Makecha, an individual closely tied to Musk, disguised as a software engineer, is telling. Equally telling is that these first documents produced withhold critical information about Makecha, his role within the agency and his relationship to Musk.

15. The Plaintiffs contend that the FCC is intentionally delaying the processing of the FOIA request. With respect to the specific need for an expedited response to its FOIA request, the consequences of delaying a response would harm the public interest by concealing potential undue influence in regulatory decisions concerning Musk and his business interests.

## JURISDICTION

16. Under FOIA, this Court "has jurisdiction to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant," 5 U.S.C. § 552(a)(4)(B), which includes granting preliminary injunctions related to expedited processing. *Wash. Post v. U.S. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 66 (D.D.C. 2006) (so holding and citing cases); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 416 F. Supp. 2d 30, 35 (D.D.C. 2006); *see also Al-Fayed v. C.I.A.*, 254 F.3d 300, 308 (D.C. Cir. 2001).

## LEGAL STANDARD

17. To "warrant preliminary injunctive relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). See also

*Winters v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).

<div align="center">

**ARGUMENT**

</div>

18. The issue raised in the Motion is simple and straightforward. After acknowledging

that the Plaintiffs' request satisfied the FOIA standard for expedited treatment, the FCC has

taken no further action. Rather, at every opportunity it has failed to act or sought to delay the

processing of Plaintiffs' request. Plaintiffs are entitled to a preliminary injunction because they

are likely to succeed on their request for documents. There is an urgent need to inform the public

about the matters that are the subject of Plaintiffs' request and to prevent irreparable harm if the

records are not promptly processed and released. The balance of equities and public interest

favor the requested relief.

**I. Plaintiffs are Likely to Succeed on the Merits.**

19. Defendant has granted Plaintiffs' application for expedited processing, yet has failed

to provide any of the documents sought, except a trivial few under compulsion. It is crystal clear

that the agency is delaying the processing of Plaintiffs' request and will continue to delay

production unless it is ordered to do so by a date certain. FOIA provides that "[a]n agency shall

process *as soon as practicable* any request for records to which the agency has granted expedited

processing." 5 U.S.C. §552(a)(6)(E)(iii) (emphasis added). After the agency responds, it must

make nonexempt records "'promptly available,'" which "typically [means] within days or a few

weeks of a 'determination', not months or years." *CREW v. FEC*, 711 F.3d 180, 188-89, 404 U.S.

App. D.C. 275 (D.C. Cir. 2013) (quoting 5 U.S.C. § 552(a)(3)(A), (a)(6)(C)(i)). See also, *Am.*

*Oversight v. United States Dep't of State 414 F. Supp. 3d 182 (D.D.C. 2019)*. Where expedited

processing has been granted by an agency, courts in this District have required the government to

<div align="center">

10

</div>

process FOIA requests by a date certain to avoid the records requested becoming stale after that date, and thus being of little value to inform the public of ongoing proceedings of national importance. A plaintiff may demonstrate a likelihood that it is entitled to have processing completed quickly enough so that "the value of the information would not be lessened or lost." *Brennan Ctr. for Just. at NYU Sch. of Law v. Dep't of Com.*, 498 F. Supp. 3d 87, 99 (D.D.C. 2020) (citing *Ctr. for Pub. Integrity v. U.S. Dep't of Defense*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019); *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 185 (D.D.C. 2019); *Wash. Post*, 459 F. Supp. 2d at 76).

20. Plaintiffs' FOIA request seeks records reflecting communications between employees of the FCC and various persons purporting to have an affiliation with DOGE and who are close associates, including current and former employees of Elon Musk or one of his companies. As discussed supra, during this period the FCC acted favorably on several of Starlink's key requests.

21. Starlink is constantly before the FCC seeking new frequencies, orbital slots and regulatory relief. For example, the FCC is currently in the process of considering certain broadband deregulation actions that may have been influenced by DOGE staffers and could directly help Musk's Starlink service. See discussion, para. 23 below. The disclosure of the requested documents is necessary to inform the public concerning this matter that may impact how broadband is made available. *See, e.g.*, *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 12; *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32 (D.D.C. 2020); *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d 30. "An informed public is 'a structural necessity in a real democracy." *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 12 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). But an informed public can only serve its proper

function when its members have timely information because "the primary value of the information lies in its ability to inform the public of ongoing proceedings of national importance[.]" *Id.* at 12 (quoting *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)). Courts recognize the imperative of getting information into public hands before it goes stale, understanding that "'stale information is of little value.'" *Id.* at 12-14.

22. Plaintiffs' are likely to succeed on the merits. The agency's dilatory tactics may not be rewarded by allowing it to continue to sit on documents that may well reveal undue influence favoring Musk's business interests. Effective public participation in FCC proceedings related to SpaceX/Starlink requires access to this vital information.

## II. Plaintiffs Will Suffer Irreparable Injury Absent the Preliminary Injunction.

23. Plaintiffs will suffer irreparable injury absent a preliminary injunction ordering expedited production. DOGE has operated without any meaningful oversight, transparency, or accountability. Questions concerning conflicts of interest and undue influence remain unanswered. Potential ex parte contact rule violations linger as well. The FCC currently has before it various proceedings that directly affect the financial interests of Musk's Starlink service.  For example, on August 4, 2025, the FCC adopted a Notice of Inquiry ("NOI") to examine whether "advanced telecommunications capability" is available to all Americans[12] Among other changes, the NOI proposes to abolish the long-term goal of 1,000 Mbps download and 500 Mbps upload for broadband speeds that the FCC established in its 2024 Report. It would likely revert to the previous 100/20 Mbps minimum standard in order to accommodate

---

[12]  *In the Matter of Inquiry Concerning Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, ("*Advanced Telecommunications* Capability")GN Docket No. 25-223, FCC 25-46, 2025 FCC LEXIS 1646 (2025), paras. 8-11.

technologies, including satellite, that struggle to achieve even the antiquated minimum speeds. A recent study reveals that Starlink is providing the minimum speed to only 17.4% of its customers.[13] The FCC's lowering the standard would give Starlink a better chance to qualify for hundreds of millions of dollars in Rural Digital Opportunity Fund grants. Furthermore, the report tied to the NOI "must be issued within 180 days after release of the Notice."[14] If DOGE has exerted undue influence on the FCC to serve Musk and Starlink's financial interests, expedited disclosure of the FOIA documents will inform the public of these misdoings and enable meaningful public participation in this and other proceedings.

24. "The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016). "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* at 7-8 (quoting *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d at, 297. "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy,* at 297). "[C]ourts in this District 'have generally found irreparable harm in FOIA preliminary-injunction cases only where the requested documents are time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost.'" *Heritage Found. v. U.S. Dep't of State*, 2024 U.S. Dist. LEXIS 196584, at *4, (quoting " *Heritage Found. v. U.S. EPA*, No. 23-cv-748 (JEB), 2023 U.S. Dist. LEXIS 66153, 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (citation omitted). This is precisely such a case.

---

[13] Supan, Joe, July 28, 205, Despite Starlink's Improved Speeds, It Still Misses the FCC's Broadband Standard https://www.cnet.com/home/internet/despite-starlinks-improved-speeds-it-still-misses-the-fccs-broadband-standard/.

[14] *Advanced Telecommunications Capability*, Id.

25. First, Plaintiffs and the American public have already suffered actual and great harm by Defendant's violations of FOIA and will continue to suffer such harm if the FCC further delays disclosure of the requested information. Plaintiff Nina Burleigh is a journalist primarily engaged in disseminating information to the public. Plaintiff Frequency Forward "is a public-interest organization and consumer advocacy watchdog dedicated to promoting greater transparency and accountability at the FCC."[15] This case goes to the heart of Plaintiffs' mission, to inform the public. By disseminating this information to the public, the public can use this information to participate in the debate about telecommunications policy and the expansion of broadband internet service to rural and underserved communities. "District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017). Plaintiffs' right to meaningful access to public records and their ability to inform the public about the FCC's ongoing operations will be irreparably harmed if Defendant does not promptly process their request and produce all non-exempt records along with *Vaughn* index on an expedited schedule.

### III. The Balance of Equities and Public Interest Favor Granting a Preliminary Injunction.

26. The balance-of-equities and public-interest factors likewise weigh strongly in favor of issuing a preliminary injunction. These factors require courts to "balance the competing claims of injury and . . . consider the effect on each party with the granting or withholding of the requested relief," in addition to paying "particular regard for the public consequences in

---

[15] https://frequencyfwd.com

employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). When "the Government is the opposing party," the two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

27. A preliminary injunction serves "the citizens' right to be informed about 'what their government is up to.'" *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989); *see also Ctr. to Prevent Handgun Violence v. U.S. Dep't of the Treasury*, 49 F. Supp. 2d 3, 5 (D.D.C. 1999) (describing the "public benefit in the release of information that adds to citizens' knowledge" of government activities). "[P]ursuant to the statutory provision mandating expedited treatment, the public's interest in expedited processing of the plaintiff's request outweighs any general interest that it has in first-in-first-out processing of FOIA requests." *Wash. Post*, 459 F. Supp. 2d at 76 (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977)). Where, as here, "[t]he government concedes that the plaintiff here has a statutory right to expedited processing" with respect to Plaintiffs' FOIA request, "the public's interest in this case is best assessed through the statutory provisions passed by the public's elected representatives." *Wash. Post*, 459 F. Supp. 2d at 76; *see also Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 14 (finding that in view of the ongoing impeachment proceedings, "extraordinary circumstances presented in this case warrant such line-cutting"); *Brennan Ctr.*, 498 F. Supp. 3d at 103.

28. The FCC has had over six months to produce the requested documents. Thus far it has produced 35 pages of questionable information. It has offered excuses and delay over any meaningful attempt to provide the requested records. Its most recent request in the July 23, 2025 Status Report, which the Court routinely granted, is equally noncommittal and is plainly

15

inadequate.[16] Defendant obligates itself only to provide by October 23, 2025, nothing more than an estimate of the final production date, and qualifies even that with the prospect of coordination with other entities, governmental or otherwise. A preliminary injunction requiring timely disclosure of records is decidedly in the public interest.

## CONCLUSION

29. For the foregoing reasons, Plaintiffs request that this Court issue a preliminary injunction requiring Defendant to fully process and produce all non-exempt records along with a *Vaughn* index no later than October 10, 2025.

<div style="margin-left:40%">

By:     /s/ Arthur Belendiuk
        Arthur V. Belendiuk
        D.C. Bar No. 336768
        Smithwick & Belendiuk, P.C.
        5028 Wisconsin Avenue, N.W., #301
        Washington, D.C. 20016
        (202) 363-4559

</div>

Dated: August 25, 2025

---

[16] Status Report, (ECF No. 11), Para. 8, "Therefore, Defendant respectfully requests that the Court order Defendant to file another status report by October 23, 2025. At that time, Defendant anticipates knowing the page count for potentially responsive records, which will allow for an estimate of a final production date, subject to any consultations or referrals."