UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NINA BURLEIGH, et al.,<br><br>       Plaintiffs,<br><br>  v.<br><br>FEDERAL COMMUNICATIONS<br>COMMISSION,<br><br>       Defendant. | Civil Action No. 25-1268 (ABJ) |

**<u>MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 1

    I.       The FOIA Request and Complaint ......................................................... 1

    II.      The FCC's Search and Production.......................................................... 2

          A.      Attempts to Define Search Parameters ....................................... 2

          B.      Initial and Supplemental Searches for Parts 1-7 ........................ 4

          C.      Supplemental Searches for Part 8 ............................................... 8

LEGAL STANDARD......................................................................................................... 9

    I.       Summary Judgment ................................................................................ 9

    II.      FOIA Standards .................................................................................... 10

ARGUMENT................................................................................................................... 11

    I.       Defendant Conducted a Reasonable Search for Responsive Records. ................. 11

          A.      The searches for the first seven subparts were reasonable. ...................... 12

          B.      The Search for Subpart Eight................................................... 17

    II.      The FCC's declaration is entitled to a presumption of good faith. ....................... 19

    III.    The FCC Appropriately Withheld and/or Redacted Records Subject to FOIA Exemptions. .................................................................................. 20

    IV.    The FCC Produced the Reasonably Segregable Information. ............................. 28

CONCLUSION................................................................................................................ 29

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Am Ctr. for L. & J. v. U.S. Dep't of Homeland Sec.*,
573 F. Supp. 3d 78 (D.D.C. 2021) ............................................................................. 3

*Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*,
392 F. Supp. 3d 100 (D.D.C. 2019) ......................................................................... 23

*Am. Immig. Council v. U.S. Dept. of Homeland Sec.*,
950 F. Supp. 2d 221 (D.D.C. 2013) ......................................................................... 21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................. 10

*Armstrong v. Exec Office of the President*,
97 F.3d 575 (D.C. Cir. 1996) ................................................................................... 28

*Bigwood*,
132 F. Supp. 3d at 140–41 ..................................................................... 14, 15, 20, 29

*Campbell v. U.S. Dep't of Just.*,
164 F.3d 20 (D.C. Cir. 1998) ....................................................................... 15, 16, 17

*Canning v. Dep't of Just.*,
567 F. Supp. 2d 104 (D.D.C. 2008) ......................................................................... 28

*Cato Inst. v. DOD*,
No. 21-1223, 2023 WL 3231445 (D.D.C. May 3, 2023) ..................... 4, 5, 6, 7, 8, 9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................... 9

*CIA v. Sims*,
471 U.S. 159 (1985) ................................................................................................. 10

*Concepcion v. FBI*,
606 F. Supp. 2d 14 (D.D.C. 2009) ........................................................................... 25

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*,
975 F.2d 871 (D.C. Cir. 1992) (en banc) ................................................................. 22

*Ctr. for Auto Safety v. NHTSA*,
809 F. Supp. 148 (D.D.C. 1993) .............................................................................. 26

*Ctr. for Auto Safety*,
809 F. Supp. ............................................................................................................. 26

*Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative*,
237 F.Supp.2d 17 (D.D.C. 2002) ............................................................................. 12

*Cuban v. SEC,*
    795 F. Supp. 2d 43 (D.D.C. 2011) ................................................................................... 22

*Dep't of State v. Wash. Post Co.,*
    456 U.S. 595 (1982) ........................................................................................................ 25

*Dixon v. Dep't of Just.,*
    279 F. Supp. 3d 1–6 (D.D.C. 2017) ............................................................................. 3, 4

*Eddington v. U.S. Dep't of Def.,*
    35 F.4th 833 (D.C. Cir. 2022) ........................................................................................ 19

*Freedom Watch, Inc. v. Dep't of State,*
    925 F. Supp. 2d 55 (D.D.C. 2013) ................................................................................... 3

*Hamilton Sec. Grp. Inc. v. Dep't of Hous. & Urban Dev.,*
    106 F. Supp. 2d 23 (D.D.C. 2000) .................................................................................. 2

*Heartland All. for Hum. Needs & Hum. Rts. v. U.S. Immigr. & Customs Enf't,*
    406 F. Supp. 3d 90 (D.D.C. 2019) ............................................................................ 11, 13

*Heffernan v. Azar,*
    317 F. Supp. 3d 94 (D.D.C. 2018) ................................................................................. 19

*Heritage Found. v. Dep't of Just.,*
    743 F. Supp. 3d 29 (D.D.C. 2024) ................................................................................. 14

*Iturralde v. Comptroller of the Currency,*
    315 F.3d 311 (D.D.C. 2003) ........................................................................................... 12

*John Doe Agency v. John Doe Corp.,*
    493 U.S. 146 (1989) .................................................................................................. 10, 11

*Jud. Watch, Inc. v. U.S. Dep't of State,*
    306 F. Supp. 3d 97 (D.D.C. 2018) .............................................................................. 26-27

*Judicial Watch, Inc. v. Food & Drug Admin.,*
    449 F.3d 141 (D.C. Cir. 2006) .................................................................................. 20, 21

*Kowalczyk v. Dep't of Just.,*
    73 F.3d 386 (D.C. Cir. 1996) ........................................................................................... 3

*Larson v. Dept. of State,*
    565 F.3d 857 (D.C. Cir. 2009) ......................................................................................... 2

*Long v. Immigration & Customs Enforcement,*
    149 F. Supp. 3d 39 (D.D.C. 2015)(E) ........................................................................... 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574–88 (1986) .................................................................................................. 10

*McDonnell Douglas Corp. v. NASA*,
  180 F.3d 303 (D.C. Cir. 1999) ................................................................. 22

*McGehee v. CIA*,
  697 F.2d 1095 (D.C. Cir. 1983) ............................................................... 11

*Meeropol v. Meese*,
  790 F.2d 942 (D.C. Cir. 1986) ................................................................. 18

*Military Audit Project v. Casey*,
  656 F.2d 724 (D.C. Cir. 1981) ................................................................. 11

*Mobley v. C.I.A.*,
  806 F.3d 568 (D.C. Cir. 2015) ................................................................. 14

*Nation Magazine v. U.S. Customs Serv.*,
  71 F.3d 885 (D.C. Cir. 1995) ................................................................... 12

*Ortiz v. Dep't of Just.*,
  67 F. Supp. 3d 109 (D.D.C. 2014) ........................................................... 11

*People for the Am. Way Found. v. Natl. Park Serv.*,
  503 F. Supp. 2d 284–98 (D.D.C. 2007) .................................................... 23

*Petroleum Info. Corp. v. Dep't of Interior*,
  976 F.2d 1429 (D.C. Cir. 1992) ............................................................... 10

*Pub. Emps. For Envtl. Responsibility v. U.S. Section, Int'l Boundary and Water Comm'n*,
  740 F.3d 195 (D.C. Cir. 2014) ................................................................. 27

*Reporters Committee for Freedom of the Press v. FBI*,
  3 F.4th 350 (D.C. Cir. 2021) ............................................................. 23, 24

*Rodriguez v. Dep't of Def.*,
  326 F. Supp. 3d 26 (D.D.C. 2017) ............................................................. 2

*SafeCard Servs. v. Sec. Exch. Comm'n*,
  926 F.2d 1197 (D.C. Cir. 1991) ......................................................... 12, 23

*SAI v. Transp. Sec. Admin.*,
  315 F. Supp. 3d 218 (D.D.C. 2018) ........................................................... 4

*Schoenman v. FBI*,
  764 F.Supp.2d 40 (D.D.C. 2011) ............................................................. 11

*Shteynlyuger v. Ctrs for Medicare and Medicaid Servs.*,
  698 F. Supp. 3d 82 (D.D.C. 2023) ..................................................... 17, 18

*Shurtleff v. United States Env't Prot. Agency*,
  991 F. Supp. 2d 1 (D.D.C. 2013) ....................................................... 26, 27

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) ........................................................................... 28

*Tax Analysts v. IRS*,
  294 F.3d 71 (D.C. Cir. 2002) ............................................................................... 27

*Tushnet v. U.S. Immigr. & Customs Enf't*,
  246 F.Supp.3d 422 (D.D.C. 2017) ........................................................................ 14

*Wash. Post Co. v. Dep't of Health & Hum. Servs.*,
  690 F.2d 252 (D.C. Cir. 1982) ....................................................................... 25, 26

*Watkins Law & Advoc., PLLC v. U.S.*,
  78 F.4th 436 (D.C. Cir. 2023) ......................................................................... 12, 13

*Welter v. U.S. Dep't of the A.F.*,
  2026 U.S. Dist. LEXIS 100446 *21 (D.D.C. 2026) ........................................... 21-22

*Wolf v. CIA*,
  473 F.3d 370 (D.C. Cir. 2007) ............................................................................. 11

**Statutes**

5 U.S.C. § 552 .................................................................................. 10, 23, 25, 28
5 U.S.C. § 13109 ........................................................................................... 22
22 C.F.R. § 171.5 ............................................................................................. 2

Pursuant to Federal Rule of Civil Procedure 56, Defendant Federal Communications Commission (FCC or the agency) respectfully files its Motion for Summary Judgment in this Freedom of Information Act (FOIA) matter.

## BACKGROUND

### I.      The FOIA Request and Complaint

Plaintiffs seek records relating to the United States Department of Governmental Efficiency (DOGE) United States Digital Service (USDS) that they believe will support their theory about USDS activity at the FCC. After conducting reasonable searches, the FCC processed 4,130 pages of responsive records. But Plaintiffs nonetheless remain convinced that unidentified documents remain.

The FCC received a FOIA request from Plaintiffs on or about February 24, 2025. SUMF ¶ 1. The request contained eight subparts seeking broad swaths of information from October 1, 2024 to the date of the search generally relating to USDS. ECF 1 (hereinafter, "Compl."); SUMF ¶ 2. The FCC considered this request to be overbroad and ill-defined, as it requested virtually any and all communications between *all* FCC personnel and individuals "affiliated with or representing USDS." Compl. 16-17; SUMF. ¶ 4. The request defined this term in a way that would include, but was not limited to, any individual who had previously worked at companies including SpaceX or Tesla; any Special Government Employee who began work with a federal agency on or after January 20, 2025 (irrespective of whether their duties were actually USDS-related); an extensive list of individuals with no actual connection to the FCC or how they were affiliated with USDS; and any "*others acting under the supervision or at the direction of the persons described*[.]" Compl. 15-16.; SUMF ¶ 5 (emphasis added). The records sought included, for example, "[a]ll documents pertaining to any past or planned meeting(s) with any Commission employee that included or includes any person or persons affiliated or associated with USDS"; "[a]ll documents

exchanged between any employee of the FCC and any person affiliated with or representing USDS"; and "[a]ll documents by persons affiliated with or representing USDS relating to access to any records of the FCC including data repository, database, system of records, computer matching program, code base, or other system containing information." Compl. at 16-17. The FOIA request did not include any search terms. *Id*.; *see also* SUMF ¶ 2

Plaintiffs filed their one-count complaint on April 24, 2025, alleging violations of FOIA for failure to produce responsive records within the statutory limits for processing. Compl. The Complaint included approximately seven pages of Plaintiffs' allegations and impressions regarding USDS, Elon Musk, and SpaceX that cited X posts, news articles, and generally engaged in argument outside the scope of whether the FCC timely responded to the FOIA request. *Id*.

## II.    The FCC's Search and Production

### A.    Attempts to Define Search Parameters

The FCC maintained that the request was overbroad, unduly burdensome, and ill defined. *See* supra Section I. "The burden of adequately identifying the record requested lies with the requester," 22 C.F.R. § 171.5(c), "and adequacy [of a search] is measured by the reasonableness of the effort in light of the specific request." *Larson v. Dept. of State*, 565 F.3d 857, 869 (D.C. Cir. 2009). While this court has held that agencies may not narrow the scope of its search to exclude relevant information without legitimate reason, *Rodriguez v. Dep't of Def.*, 326 F. Supp. 3d 26, 36-37 (D.D.C. 2017), an agency may "construe the request as it reasonably sees fit" when faced with a "vague and poorly worded request." *Hamilton Sec. Grp. Inc. v. Dep't of Hous. & Urban Dev.*, 106 F. Supp. 2d 23, 33 (D.D.C. 2000).

This Court has found that requests that ask for all documents "referencing," "regarding," or "relating to" given topics have been dismissed as overbroad or not reasonably describing the records sought, as such broad descriptions do not allow the agency "to determine precisely what

records are being requested." *Am Ctr. for L. & J. v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 85 (D.D.C. 2021) (quoting *Tax Analysts v. I.R.S.*, 117 F.3d 607, 610 (D.C. Cir. 1997)). And, it was unreasonable where plaintiff failed to limit its search to individuals who might have had something to do with the issue that prompted the request. *Id. See also Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 61-3 (D.D.C. 2013).

An agency "is not obliged to look beyond the four corners of the request for leads to the location of responsive documents," *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996), and is not obligated to cross-reference information maintained by other agencies. *Dixon v. Dep't of Just.*, 279 F. Supp. 3d 1, 5–6 (D.D.C. 2017), *aff'd*, No. 17-5223, 2018 WL 4610736 (D.C. Cir. 2018). To that end, the FCC is not in a position to identify "any individual employed by, volunteering with, or working in consultation with USDS, including as a Special Government Employee or are part of the DOGE Team or DOGE Team Leads" or to identify "any Special Government Employee who began work with a federal agency on or after January 20, 2025."

Accordingly, the FCC conferred with Plaintiffs in an effort to define the scope of their improperly defined request. SUMF ¶ 7. On June 12, 2025, the FCC sent Plaintiffs a narrowing letter explaining its concerns with the clarity and scope of the request and suggested ways to more concretely define 1) the date range, 2) the definition of individuals associated with USDS, and 3) the list of FCC custodians, among other proposals. *Id*. The parties subsequently discussed these terms on a video call. *Id*. While Plaintiffs agreed to drop one subpart as duplicative and exclude all mass recipient filings (such as news clips), the parties could not agree on a reasonable list of custodians or other meaningful limits. SUMF ¶ 8. The FCC sent Plaintiffs a second narrowing letter on June 17, 2025 to further address these issues. *Id*.Plaintiffs sent a response letter on June 19, 2025 that offered limited narrowing of internal FCC custodians to include all Commissioners

and Bureau Chiefs, which still constituted an overbroad subset of individuals not likely to possess responsive records and did not address other fundamental defects in the request the FCC review team had raised, such as the definition of individuals "affiliated with or representing USDS," the undefined terms in the request, or the lack of search terms. Decl.; Reply to Opposition to Motion for Discovery at 3-4 ECF 18. Plaintiffs claimed that they were not aware of any other email addresses USDS personnel were using, although Plaintiffs' counsel had represented on the prior call that they knew email addresses but would not share them. *Id.* Based on all these communications, it became apparent that the parties were not making progress to reach any reasonable agreement. SUMF ¶ 9

In the absence of a concrete and reasonable subset of identified custodians or search terms, the FCC developed a practical method for conducting the search in a way that was reasonably calculated to lead to responsive records. FCC commenced the search as follows. SUMF ¶ 12.

## B.      Initial and Supplemental Searches for Parts 1-7[1]

The FCC first requested that the Office of Managing Director (OMD), the agency's office that includes the Human Resources staff, identify any USDS personnel who were detailed to the FCC and provide documentation and communications relating to their onboarding. SUMF ¶ 13. Three individuals representing USDS were planned to be detailed to the FCC : Tarak Makecha, Jordan Wick, and Jacob Altik (collectively referred to as the "USDS personnel").[2] SUMF ¶ 14.

---

[1]      The fact that the FCC attempted a search does not contradict its reasonable position that these requests were overbroad and unreasonably described. *SAI v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 250 (D.D.C. 2018); *Cato Inst. v. DOD*, No. 21-1223, 2023 WL 3231445, at *6 (D.D.C. May 3, 2023).

[2]      Although the FCC originally believed Jacob Altik would be detailed to the FCC and took initial steps to onboard him, including setting up an Outlook account, he was ultimately never fully

OMD performed a manual search for records relating to the USDS personnel, including onboarding documents and other relevant communications, which the FCC reviewed and produced. *Id*. The search included records in the possession of Chief Human Capital Officer Ellen Standiford. SUMF ¶ 15.

The FCC next developed a list of additional custodians, beyond the OMD staff, who were reasonably likely to possess records concerning USDS. SUMF ¶ 16. The FCC review team developed this list based on the content of the initial documents produced by OMD, as well as through conversations with OMD and other leadership officials about the scope of USDS action within the FCC. Decl. Based on this information, the team determined that the FCC had limited involvement and communications with USDS members. *Id*. The FCC had implemented a DOGE Team in response to Executive Order 14158, which directed each agency to establish an internal team of at least four employees, typically including a team lead, an engineer, a human resources (HR) specialist, and an attorney. SUMF ¶ 17. The members of the FCC's DOGE team were: Scott Delacourt, Chief of Staff for the FCC and DOGE team lead; Allen Hill, then-Chief Information Officer, designated as an engineer given his knowledge about the FCC's IT systems; Ellen Standiford, Chief Human Capital Officer; and Adam Candeub, General Counsel. *Id*. The review team also identified Gregory Watson, Chief of Staff to FCC Chairman Carr, as an individual who may have been communicating with the USDS personnel or other USDS staff. The FCC reasonably believed that this group of custodians constituted the individuals who were primarily in contact with the USDS personnel or would have been the points of contact with any outside USDS staff. SUMF ¶ 17. Therefore, the FCC initiated electronic IT searches for Scott Delacourt,

---

onboarded and did not engage in any work at the FCC. SUMF ¶ 14. The FCC has nevertheless included him as a custodian in its search out of an abundance of caution.

Allen Hill, Gregory Watson, and Adam Candeub ("the FCC custodians"). The FCC did not include Ellen Standiford in this list because she was located in OMD and had already manually searched for and provided responsive records. *Id*.

Through internal discussions and document review, the FCC determined that USDS had contacted the FCC about onboarding some personnel in February 2025; the USDS personnel were onboarded in mid-March; and that Tarak Makecha and Jordan Wick were only conducting FCC business until April and May of that year, respectively. SUMF ¶ 18. The scope of their business was limited to the FCC's compliance with Executive Orders implementing cost efficiency and workforce optimization measures, which primarily included reviewing contracts to identify areas of redundancy and overspending. SUMF ¶¶ 18-20

The FCC review team first ran a search for all communications between the three USDS personnel at the FCC and the FCC custodians. SUMF ¶ 20. The FCC also searched those custodians' email addresses for any emails to or from individuals with email domains ending in "doge.eop.gov," "doge.gov," and "usds.gov," to capture communications from any other individuals working for USDS who were not directly onboarded to the FCC. SUMF ¶ 23The search also captured calendar invitations and entries. Decl. Further, the FCC searched the three USDS personnel's email boxes and Microsoft Teams communications for twenty-six keywords targeted at finding where the hires were granted access to any systems, repositories, or other shared document locations. *Id*. After discussing with custodians, the FCC determined that there were not likely to be any text messages concerning USDS matters. SUMF ¶ 21. Agency counsel spoke with the Chairman's office and confirmed that neither the Chiefs of Staff nor the Chairman had the phone numbers for the USDS personnel. *Id*. It is agency policy not to download additional messaging applications on FCC phones (e.g., Signal, WhatsApp). *Id*.

After reviewing the results of the initial IT searches, the FCC subsequently pulled the entire Outlook files for all three of the USDS personnel and reviewed them in their entirety. SUMF ¶ 24. This means that this search captured any and all communications the USDS personnel had with *any* individuals, inside or external to the FCC, during their tenure. *Id*.

While reviewing the search results, the review team noted that, because two of the USDS personnel were primarily employed at other federal agencies and had merely been detailed to the FCC, they had been conducting their government business in part using the email accounts from their home agencies. SUMF ¶ 25. Therefore, the FCC also conducted a supplemental search of the FCC custodians' emails and calendar entries for any communications to or from Tarak Makecha's Office of Personnel management (OPM) email address or Jordan Wick's General Services Administration (GSA) email address. *Id*. Every record returned from that search was duplicative of records already reviewed. SUMF ¶¶ 26-27. Therefore, the review team reasonably believed they had followed all reasonable leads and performed all supplemental searches reasonably calculated to uncover responsive results. *Id*.

The FCC produced responsive records to Plaintiffs on August 15, 2025; September 15, 2025; November 28, 2025[3]; January 16, 2026; and January 21, 2026. SUMF ¶ 28. After the January 21, 2026 production, the FCC believed it had completed all its productions. SUMF ¶ 29. At that time, the FCC had processed 3,544 pages of records. The FCC transmitted a *Vaughn* index to Plaintiffs on February 2, 2026. That index reflected that the FCC had withheld 1,590 pages in full under relevant exemptions. Plaintiffs did not challenge the *Vaughn* index, any of the redactions, or any of the withheld documents.

---

[3] All filing and discovery deadlines set to occur during the lapse in appropriations from October 1, 2025 to November 12, 2025 had been extended by 53 days from the date of the original deadlines. See Standing Order No. 25-59.

### C.    Supplemental Searches for Part 8

While the FCC had believed that it collected and produced all non-exempt, responsive records, it learned that it inadvertently omitted records responsive to subpart 8. Subpart 8 sought"[a]ll documents from January 1, 2021, to the present, relating to travel by Brendan Carr or the Carr Office to any location or facility of any Elon Musk Affiliated Entity." The FCC promptly sought to rectify the situation and supplemented its production. SUMF ¶ 33.

*First*, the FCC provided records already made public as part of another FOIA request, which sought "all FCC records including e-mails, attachments, correspondence, reports, or presentations about Commissioner Brendan Carr's trip(s) to Brownsville, Texas to watch SpaceX Starship launches." SUMF ¶ 34.

*Second*, the Special Assistant to Chairman Carr provided the FCC team with a list of all the Chairman's travel from January 1, 2021 to the date of the search (February 23, 2026). From that list the FCC identified all of the Chairman's travel to any Elon Musk-affiliated entity, including Starlink, SpaceX, Space Exploration Technologies, Tesla, X Corp, xAI, The Boring Company, or Neuralink. SUMF ¶ 35. The review team then had the Special Assistant pull all of the travel records from those identified trips. *Id*.

*Third*, the FCC initiated IT keyword searches for additional responsive email records. The FCC searched Chairman Carr's email account for records related to travel to any of the Elon-Musk affiliated locations, and from email domains associated with the relevant companies. SUMF ¶ 36. The FCC also manually searched the Chairman's Outlook calendar entries for responsive items. *Id*. The review team also searched the Outlook mailbox and calendars for Drema Johnson, Chairman Carr's former Confidential Assistant, for the same time period. *Id*.

*Fourth*, the review team requested the Office of the Chairman to search its records and identify any staff who may have attended responsive trips. SUMF ¶ 37. Gregory Watson was the

only member of Chairman Carr's staff, for the relevant time period, who traveled to any Musk-affiliated entity. Subsequently, the review team obtained Mr. Watson's travel records and performed an additional IT keyword search of Gregory Watson's Outlook to obtain emails and calendar entries related to two particular trips. *Id*. The review team believed that this search followed all reasonable leads to uncover responsive records. SUMF ¶ 38.

The FCC made its final supplemental production on April 30, 2026. SUMF ¶ 39. That production was 584 pages. *Id*. The FCC also withheld two pages of records in full. *Id*. The FCC transmitted a supplemental *Vaughn* index on May 22, 2026. *Id*. In total for all of the productions, the FCC processed 4,130 pages of responsive records; withheld 1,592 pages in full under one or more applicable FOIA exemptions; produced 853 pages that contained one or more redactions; and released 1,685 pages containing no redactions. SUMF ¶ 44.

### D.    Production Of Documents

For all of the productions, the FCC redacted material it deemed appropriate to withhold under applicable FOIA exemptions. SUMF ¶ 46. Specifically, the FCC redacted portions of records under Exemption 2; Exemption 4; Exemption 5; and Exemption 6. SUMF ¶ 45. The agency also withheld records in full under Exemption 2; Exemption 3(A); Exemption 5 and Exemption 7(E). SUMF ¶ 45. Again, Plaintiffs did not challenge any of the agency's redactions or withholdings. SUMF ¶ 52.

### LEGAL STANDARD

### I.    Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party shows there is no genuine dispute as to any material fact. *See* Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue

of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden in showing there is no genuine issue of fact. If the moving party has met its burden, the nonmoving party cannot rely upon "mere allegation or denials of his pleading" in opposing the motion. Cite. The party must rather "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment therefore is solely appropriate if the moving party has presented evidence "from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial." *Id*. at 257.

When determining whether summary judgment is appropriate, the court must view the record in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587–88 (1986); *see also Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing Fed. R. Civ. P. 56(c)) ("Summary judgment is in order where, viewing the record in the light most favorable to the non-moving party, the court finds that there remains no 'genuine issue as to any material fact.'").

## II.    FOIA Standards

FOIA requires federal agencies, upon request, to "make the records promptly available to any person" who "(i) reasonably describes" the requested records and makes the request "(ii) in accordance with published rules stating the time, place, fees (if any), and procedures to be followed." 5 U.S.C. § 552(3)(A). FOIA's "basic purpose" reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). "Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). In passing FOIA, "Congress sought to reach a workable balance between

- 10 -

the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *John Doe Agency*, 493 U.S. at 152 (citation and internal quotation marks omitted).

"FOIA cases typically are resolved on a motion for summary judgment." *Ortiz v. Dep't of Just.*, 67 F. Supp. 3d 109, 116 (D.D.C. 2014). Although the agency bears the burden of proof, "[t]he Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The agency's affidavits or declarations need to be reasonably detailed and non-conclusory. *See McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (internal quotations omitted).

## ARGUMENT

The FCC developed and conducted searches and produced records to reasonably respond to Plaintiffs' overbroad and ill-defined requests. As we have detailed previously, the FCC's search method was reasonably calculated to locate all responsive documents. Furthermore, its redactions and withholdings were appropriate under the relevant FOIA exemptions. Because there is no genuine dispute of material facts that the FCC fully satisfied its obligation under FOIA, summary judgment is warranted. *See Heartland All. for Hum. Needs & Hum. Rts. v. U.S. Immigr. & Customs Enf't*, 406 F. Supp. 3d 90, 108 (D.D.C. 2019).

I.    **Defendant Conducted a Reasonable Search for Responsive Records.**

To demonstrate that a search for documents was reasonable at the summary judgment phase, a federal agency may submit "reasonably detailed" affidavits or declarations that describe the search performed. *Schoenman v. FBI,* 764 F.Supp.2d 40, 45 (D.D.C. 2011). The affidavits or declarations may be submitted by an individual who either participated in the search or coordinated

the search. *See Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative,* 237 F.Supp.2d 17, 23 (D.D.C. 2002); *see also SafeCard Servs. v. Sec. Exch. Comm'n,* 926 F.2d 1197, 1200 (D.C. Cir. 1991). In compliance with the reasonableness standard, these affidavits "must ... set [] forth the search terms and the type of search performed, and aver [] that all files likely to contain responsive materials (if such records exist) were searched." *Nation Magazine v. U.S. Customs Serv.,* 71 F.3d 885, 890 (D.C. Cir. 1995). If the agency can make that showing, then the burden shifts to the plaintiff to provide evidence sufficient to raise "substantial doubt" about the adequacy of the agency's search. *Iturralde v. Comptroller of the Currency,* 315 F.3d 311, 314 (D.D.C. 2003) (quoting *Valencia–Lucena v. U.S. Coast Guard,* 180 F.3d 321, 326 (D.C. Cir. 1999)).

Adequacy "is generally determined not by the fruits of the search, but the appropriateness of the methods used to carry out the search." *Watkins Law & Advoc., PLLC v. U.S.*, 78 F.4th 436, 444 (D.C. Cir. 2023) (quoting *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011). An agency "need not demonstrate that all responsive documents were found and that no other relevant documents could possibly exist," as long as the agency made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d. 57, 68 (D.C. Cir. 1990) (citing *Perry v. Block*, 684 F.2d 121, 128 (D.C. Cir. 1982)). Declarant Kristi Thompson, FOIA team lead in the FCC's Office of General Counsel and review team member, provides a thorough description of FCC's search which satisfies that standard.

A.    **The searches for the first seven subparts were reasonable.**

Here, Plaintiffs did not provide or propose any specific search terms in the language of the request. *See* Compl. 16-17. Even more, Plaintiffs refused to provide the FCC with crucial information (e.g., specific email domains FCC would search for). SUMF ¶ 8. As outlined above, Plaintiffs also sought broad swaths of information with undefined parameters, seeking information

on eight wide-ranging categories of information "concerning … USDS matters." Compl. at 16-17. Therefore, the FCC developed parameters for its search by conducting an initial manual search for documents relating to the onboarding of USDS personnel and internal conversations, conducting internal discussions with OMD and other agency officials to glean information on which personnel worked on USDS matters, making its best attempt to canvass email domains individuals associated with USDS would have been using, and building off of concrete leads developed throughout the search. SUMF ¶ 12.

The FCC initiated a preliminary search by asking OMD to provide all copies of the onboarding documentation for USDS team members at the FCC. SUMF ¶ 13. The FCC used those documents, and conversations with OMD, to determine the scope of individuals who were onboarded as USDS personnel. *Id*. Additionally, through conversations with knowledgeable parties and the face of records initially discovered, the FCC also developed a list of initial FCC custodians. SUMF ¶15. Based on documentary information and discussions with leadership, the FCC determined that other custodians were unlikely to be conducting any business relating to USDS. SUMF ¶21. This included confirming that, to the knowledge of OMD and those assigned to the DOGE team, nobody on the list of named individuals Complaint provided in the instructions to its FOIA request was reasonably likely to have been in communication with FCC personnel at all, much less working on "USDS matters." SUMF ¶21.; Compl. at 16.

The development of this custodian list was reasonable. "An agency does not need to search 'every record system' for the requested documents." *Heartland All.*, 406 F. Supp. 3d at 117 (quotations omitted). It is reasonable to have "individuals well-positioned to have knowledge" determine the appropriate locations of responsive records." *Id.* And, a request for an agency to search a particular location, without more, does not constitute a lead that an agency must pursue,

- 13 -

unless it is so "clear and certain" that the agency must in good faith pursue it. *Mobley v. C.I.A.*, 806 F.3d 568, 582 (D.C. Cir. 2015) (quoting *Kowalczyk*, 73 F.3d at 389). In any event, the adoption of a rule "which would allow a requester to dictate, through search instructions, the scope of an agency's search, the reasonableness test for search adequacy long adhered to in this circuit would be undermined." Mobley, 806 F. 3d at 582. This Court has also found that, where part of plaintiff's request was overbroad, seeking "all documents and communications" between employees of various U.S. attorney's offices related to a particular topic, it was "eminently reasonable" for the agency to choose not to reject the request but rather limit the list of custodians with whom employees were likely to actually have corresponded. *Heritage Found. v. Dep't of Just.*, 743 F. Supp. 3d 29, 38-39 (D.D.C. 2024).

Ms. Thompson's declaration further explains which electronic searches the review team ran, using which terms; and any and all supplemental searches performed, including following up on leads uncovered during the initial review process. SUMF ¶¶ 21-24. The FCC confirmed that an electronic IT search would uncover all communications on Outlook or Microsoft Teams, and that it is agency policy not to download additional messaging applications on FCC phones. SUMF ¶ 22. Additionally, it is and was at all relevant times, agency policy not to use personal phones to conduct government business. Decl. Agencies generally have 'discretion in crafting a list of search terms' as long as they are 'reasonably tailored to uncover documents responsive to the FOIA request.'" *Tushnet v. U.S. Immigr. & Customs Enf't*, 246 F.Supp.3d 422, 434 (D.D.C. 2017) (quoting *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 140–41 (D.D.C. 2015)). Where the search terms are reasonably calculated to lead to responsive documents, a court should neither "micromanage" nor second guess the agency's search. *Bigwood*, 132 F. Supp. 3d at 140–41.

- 14 -

The first IT search included four searches targeted at finding information responsive to the first seven subparts of the request. SUMF ¶¶ 20-23. The date range for all of these searches was October 1, 2024 to the date of the search, which was the date parameter in the request. *Id*. The first search was for any email sent to the FCC custodians from any of the USDS personnel, or to any individual with email domains ending in "doge.eop.gov," "doge.gov," and "usds.gov," as these were the domains the FCC believed any individuals affiliated with USDS may be using. *Id*. Second, any emails sent or received by the USDS personnel containing any of twenty-six key terms targeted at finding information on documents received, produced, or disseminated related to USDS, documents exchanged between FCC employees and USDS, or access to any records systems, including general terms like "system," "database," "codebase," and "repository" as well as the names of systems unique to the FCC, including "K Drive," "Monster," "Genesis," and "Paycheck 8." SUMF ¶ 23. The terms included various permutations of general terms (for example, searching for not only "K Drive" but also "K: Drive," "K-Drive," and K- Drive") to ensure any responsive results would be captured. *Id*. Third, the search sought all Outlook calendars for the USDS personnel, and all calendar entries for the FCC custodians with anyone using a USDS-affiliated email domain. *Id*. These were reasonably likely to yield responsive records because they targeted individuals most likely to be engaging in USDS business and included multiple permutations of key terms that were both general and specific to FCC systems.

"An agency has discretion to conduct a standard search in response to a general request, but it must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 28 (D.C. Cir. 1998). The FCC did so in this case. After reviewing the results of this first search, the FCC ran an IT search to pull and review the entire Outlook files for the USDS personnels' FCC email addresses.

SUMF ¶ 24. This meant that the review team looked at *every email and calendar entry* to or from the USDS personnel for the requested time period: October 1, 2024 to July 22, 2025, the date of that search. *Id*. This includes any and all communications those individuals had with every employee of the FCC or parties outside the FCC. *Id*.

During the course of the search, the review team also noted that two of the USDS personnel appeared to be at times using different government email addresses. SUMF ¶¶ 26-27. Thus, the team performed a supplemental search of the FCC custodians' Outlook files for any sent emails or calendar entries from those two additional email addresses. *Id*. However, the team confirmed that all of the results returned from this search were duplicative of records already identified. SUMF ¶ 26. Therefore, the FCC reasonably concluded that there were no leads indicating it should search other locations for these additional email addresses, since additional searches were also likely to return duplicative results. SUMF ¶ 27.

As noted above, the FCC did not conduct an initial search for responsive text messages based on reasonable belief developed 1) from representation by the FCC custodians that they did not conduct FCC business including substantive work with the USDS personnel over text message and 2) the lack of concrete leads uncovered during the search indicating that responsive text messages existed. However, in Plaintiffs' motion for discovery, they cited a single email from records the FCC had produced in support of the claim that responsive text messages existed. That email, sent from FCC General Counsel Adam Candeub to Tarak Makecha on March 12, 2025, referenced a prior text message. Although the FCC reasonably believed the email constituted a memorialization of the text conversation, it nevertheless produced the entire thread of text messages that exist between Adam Candeub and Tarak Makecha in response to Plaintiffs' concern. SUMF ¶ 31. The content of that text thread reinforces that the default FCC practice was to conduct

- 16 -

agency business over email, not text. *Id*. The review team did not see any leads indicating other responsive text messages exist. SUMF ¶ 32.

Agencies can be required to search text messages when it is "reasonably likely" that an employee conducted agency business on a pertinent topic via text. *Shteynlyuger v. Ctrs for Medicare and Medicaid Servs.*, 698 F. Supp. 3d 82, 109 (D.D.C. 2023). However, in that case, where one email exchange where a federal employee shared her cell phone number so she could be easily reachable at a time when movement on government business might occur, that did not constitute "a lead that is both clear and certain" regarding the existence of potentially responsive text messages. *Id*. This reflects a higher bar for leads than mere speculation. Even if the March 12 email represented a clear and certain lead for text messages between those two parties, it did not indicate that any other messages between other parties existed. The review team did not see any other communications indicating that other responsive text messages existed. SUMF ¶ 32.

Thus, the FCC also reasonably searched all reasonable locations by thoroughly canvassing the files of all custodians that could reasonably constitute being affiliated with USDS: the FCC DOGE team; any individuals with a USDS email address; the entire Outlook files for the USDS personnel embedded at the FCC; and search of other email addresses the FCC learned that the USDS personnel had been using. The FCC developed a list of initial custodians after conferring with individuals well-positioned to have knowledge, and did not develop reason to believe that other custodians would possess responsive material based on clear leads uncovered as part of the search.

## B.    The Search for Subpart Eight

The FCC inadvertently omitted from its initial searches records responsive to subpart 8 of the request when it produced what it believed was its final production and *Vaughn* index to Plaintiffs. SUMF ¶ 33. When the FCC realized its error, through Plaintiffs' motion to take

discovery, it immediately initiated a supplemental search for responsive items. *Id*. Even where an agency initially omits responsive records, there is no bad faith when the agency cooperates with the plaintiffs by responding to inquiries, conducting additional searches, and producing records when the error is discovered. *Meeropol v. Meese*, 790 F.2d 942, 953(D.C. Cir. 1986). The FCC attempted to engage in such cooperation in this case: when Plaintiffs noted their concern that there were missing records, the FCC asked which records were missing and noted that the agency was immediately conducted a search. This effort proved futile as the Plaintiffs were unwilling to work with the agency in any meaningful way.

The search for records responsive to subpart 8 was also reasonable. As Ms. Thompson's declaration sets forth, the FCC requested manual searches and ran additional IT search term requests for responsive documents. SUMF ¶ 33. The Special Assistant to Chairman Carr provided travel authorization records from E2, the system used to process FCC travel forms, on or around the dates the review team believed the Chairman may have been traveling to any Elon Musk-affiliated entity, as defined in Plaintiffs' request. SUMF ¶ 34. The FCC confirmed that as far as the Special Assistant is aware, these are the only official documents prepared when the Chairman travels, and therefore if a trip is not included in the E2 travel log it would not have been an official FCC trip. SUMF ¶ 34.

After collecting this information, the FCC also initiated IT keyword searches for any emails to Chairman Carr from January 1, 2021 to the date of the search 1) containing keywords related to both travel and the name of any Musk-affiliated companies and 2) from email domains likely to be associated with Musk-affiliated companies. SUMF ¶ 36. The FCC also collected Outlook calendars for Chairman Carr from January 1, 2021 until the date of the search and manually searched those entries for responsive items. *Id*. The FCC collected Outlook emails and calendars

from Drema Johnson, former Confidential Assistant to Chairman Carr, and conducted the same manual search for responsive items.

Again, the FCC followed reasonable leads to discover additional responsive records. The FCC determined that Gregory Watson was the only FCC staff member from the Chairman's Office who traveled to a Musk-affiliated entity during the relevant time period. SUMF ¶35. Mr. Watson's assistant provided copies of all of his E2 travel records, and the review team was able to identify the responsive trip. Subsequently, the FCC performed an additional IT keyword search for Ms. Watson's related emails and calendar entries. SUMF ¶¶ 20, 26.

In sum, the FCC again identified custodians based on discussions with knowledgeable individuals; conducted both manual and IT searches; and followed up on reasonable leads. Thus, this portion of the search was also more than reasonable.

## II.    The FCC's declaration is entitled to a presumption of good faith.

An agency's declaration is entitled to a presumption of good faith where the declaration is relatively detailed and non-conclusory. *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 838 (D.C. Cir. 2022). Purely speculative claims from a plaintiff about additional records and discoverability are insufficient to overcome this presumption of good faith. *Id.* at 839. *See also Heffernan v. Azar*, 317 F. Supp. 3d 94, 105 (D.D.C. 2018) (Given that adequacy of a search is determined by the appropriateness of the methods rather than the fruit of the search, "it is clear that a plaintiff's unsubstantiated belief that missing records exist cannot demonstrate the inadequacy of an agency's search, and this Circuit has dismissed as 'mere speculation' [] arguments from plaintiffs that the agency did not locate documents that the plaintiffs suspected to exist.") (quoting *Parker v. U.S. Immig. & Customs Enf't*, 238 F.Supp.3d 89, 102 (D.D.C. 2017)) (cleaned up).

**III.    The FCC Appropriately Withheld and/or Redacted Records Subject to FOIA Exemptions.**

Plaintiffs have not challenged the FCC's withholdings. In any event, such a challenge would fail. The FCC's withholdings and redactions were entirely appropriate.

The FCC's *Vaughn* indexes "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record, nor by evidence of agency bad faith." *Bigwood*, 132 F. Supp. 3d at 136 (quoting *Larson*, 565 F.3d at 862). As set forth in the February 2, 2026 *Vaughn* index and the May 22, 2026 supplemental *Vaughn* index, the FCC redacted portions of records under FOIA Exemption 2; Exemption 5; Exemption 4; and Exemption 6. The agency also withheld records in full under Exemption 2; Exemption 3(A); Exemption 5; and Exemption 7(E).  Exs. 2 and 3.

The FCC's *Vaughn* indexes record, as to documents that contain redactions; the general category of the type of information being withheld; which FOIA exemption or exemptions apply to a given category of information; the Bates numbers of each redaction; and a written description of the nature of the material redacted and why disclosure of that material would foreseeably result in harm to the agency.  Exs. 2 and 3.

*Vaughn* indexes organized by category are not only permissible but often more efficient in cases like this, where there are a high volume of records with material covering the same or similar topics: "Especially where the agency has disclosed and withheld a large number of documents, categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons. In such cases, particularity may actually impede court review and undermine the functions served by a *Vaughn* index." *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 147 (D.C. Cir. 2006). The FCC explained its redactions

through "*commonalities*, not *generalities*." *Id.* (emphasis in original). The FCC's *Vaughn* indexes contained detail about the exact nature of the documents, why they were privileged, and provided sufficient context for Plaintiffs to identify the information surrounding each of the redactions, including what type of communication they were sent in, who sent them, and the context of the rest of the conversation. *Am. Immig. Council v. U.S. Dept. of Homeland Sec.*, 950 F. Supp. 2d 221, 235 (D.D.C. 2013) (describing the general requirements for withholding). With respect to documents withheld in full, the FCC did not take a categorical approach, but offered an individualized explanation for each withholding, including a description and explanation of the asserted privilege; the title of the document fully withheld; the Bates number of the record to which it was attached, which would allow the reviewer to access contextual details about the conversation, sender, and recipient; and the date of the transmitting communication. Exs. 2 and 3.[4] The FCC included an explanation of why the release of each type of information would cause foreseeable harm.

### A. Exemption 2

Exemption 2 applies to internal personnel rules and practices of federal agencies. *Welter v. U.S. Dep't of the A.F.*, 2026 U.S. Dist. LEXIS 100446 *21 (D.D.C. 2026) (citing *Elliot v. USDA*, 596 F.3d 842, 845 (D.C. Cir. 2010); *see also Milner v. Dep't of the Navy*, 562 U.S. 562, 570 (2011). Here, the FCC released in part, onboarding and offboarding materials, including access protocols and procedures. The FCC withheld in full a document containing employee start date, job series code, bargaining unit status, and duty station location. *See* Ex. 2 at pgs. 1, 18. These documents fall squarely within the meaning of Exemption 2. *Crooker v. Bureau of Alcohol, Tobacco &*

---

[4] As an illustrative example of how the *Vaughn* indexes meet the relevant standards, the FCC redacted records based on deliberative process privilege over eleven categories of records. The FCC additionally withheld thirteen individual records in full under deliberative process privilege.

*Firearms*, 670 F.2d 1051, 1073 (D.C. Cir. 1981) (predominantly internal document at issue consisted "solely of instructions to agency personnel"). Disclosure of this information would undermine the efficient functioning of the agency's onboarding processes, undermine the efficient functioning of the agency's internal personnel recording system, and compromise FCC security. The Exemption 2 claim is proper.

### B. Exemption 3(A)

Exemption 3(A) "protects from disclosure documents "specifically exempted from disclosure by statute […] if that statute…requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." *Cuban v. SEC*, 795 F. Supp. 2d 43, 61 (D.D.C. 2011) (quoting 5 U.S.C. § 552(b)(3)). Here, the FCC withheld the Confidential Disclosure Report for Jordan Wick, one of the members of the DOGE team. This document is prohibited from disclosure under the Ethics in Government Act. *See* 5 U.S.C. § 13109(a)(2). *See* Ex. 2 at pg. 15. Thus, the FCC's withholding is proper.

### C. Exemption 4

Exemption 4 protects from disclosure, "trade secrets and commercial or financial information obtained from a person and privileged or confidential. *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303 (D.C. Cir. 1999) (citing 5. U.S.C. § 552(b)(4)). The FCC redacted information that is customarily and kept confidential by FCC vendors. *See* Ex. 2 at pg. 4. The communications contain specific unit pricing, number of licenses, and cost per license. *Id*. This is the kind of information that would not be released to the public by the contractors from whom the FCC obtained the information. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc). Disclosure of this information would harm the contractor's commercial interests by providing an advantage to competitors whose similar unit pricing

information is not disclosed. Further, disclosure would impede the FCC's ability to obtain similar information from these or other vendors. Therefore, the Exemption 4 claim is proper.

### D. Exemption 5

The FCC properly withheld information under FOIA Exemption 5, which applies to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 applies to inter-agency or intra-agency documents covered by the deliberative process privilege, which protects the deliberative or policymaking processes of government agencies. *People for the Am. Way Found. v. Natl. Park Serv.*, 503 F. Supp. 2d 284, 297–98 (D.D.C. 2007). An agency asserting the deliberative process privilege must show that the document is both "predecisional" and "deliberative." *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991).

"A document is predecisional if it was generated before the adoption of an agency policy and deliberative if it reflects the give-and-take of the consultative process." *Am. Ctr. for L. & Just. v. U.S. Dep't of Just.*, 392 F. Supp. 3d 100, 106 (D.D.C. 2019) (quotations omitted). Additionally, to withhold material under this or any exemption, an agency must be able to articulate the nature of foreseeable harm that would occur if the records were released, including linking the nature of the harm to the information contained in the material withheld. *Reporters Committee for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021). Agencies can satisfy this burden on a category-by-category basis where they independently demonstrate the harm for each category. *Id*.

For each category of deliberative process privilege, the FCC noted the general topic of the record and the underlying decision. Exs. 2 and 3. For example, Category 3 identified records redacted in part because they were communications regarding the agency's Delete, Delete, Delete initiative. Ex. 2 at pg. 3. The FCC identified, within this overall category, which Bates numbers

- 23 -

contained redactions under deliberative process privilege, as opposed to which Bates numbers contained redactions under both deliberative process privilege and attorney-client privilege. The description further explained that as to deliberative process, the redacted material constituted: Inter- and intra-agency predecisional deliberations regarding the implementation of the agency's Delete, Delete, Delete deregulatory initiative, consistent with Executive Orders and DOGE's mandate. The discussions include advice and recommendations, including legal research; requests for initial impressions and updates; opinions and impressions regarding tools to potentially implement deregulatory efforts; and discussions of what factors and specific data points to consider in deregulatory review process. Ex. 2 at pg. 3. This provided specific detail about the nature of the communications, why they represented a back-and-forth part of the decision-making process, and the non-final policy decision to which those communications related. Each of the records cited included information on which custodians sent the records and when, as well as other conversational context. Furthermore, the description clearly set forth an explanation of how disclosure of the material would lead to foreseeable harm. *Id*.

Disclosure of this material would create a chilling effect on the staff at the FCC and other federal executive agencies from frankly and candidly proposing ideas and exchanging views while planning and collaborating on implementing deregulation initiatives, as well as other presidential directives, which will degrade the quality of agency decision-making. Ex. 2 at pg. 3. The FCC included detailed, individualized descriptions for each of these categories. *See* Ex. 2 at pg. 6 (Category 7 captures communications regarding interagency data sharing, and the description further explains that the redacted material encompasses "discussion exploring how and whether to share data across agencies in response to Executive Order 14243 on eliminating information silos,

prior to any determination being reached."). The FCC properly claimed Exemption 5 as to these records.

### E. Exemption 6

FOIA Exemption 6 protects information contained in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The term "similar files" is construed broadly, and it is "intended to cover detailed Government records on an individual which can be identified as applying to that individual." *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). The threshold inquiry is minimal, such that "[a]ll information which applies to a particular individual is covered by Exemption 6, regardless of the type of file in which it is contained." *Concepcion v. FBI*, 606 F. Supp. 2d 14, 35 (D.D.C. 2009); *see also Wash. Post Co. v. Dep't of Health & Hum. Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982) ("All information which 'applies to a particular individual' is covered by Exemption 6, regardless of the type of file in which it is contained." (quoting *Wash. Post*, 456 U.S. at 602)).

Here, the Agency released in part personally identifiable information and similar information regarding individuals, email addresses of employees of other federal executive agencies, video and teleconference meeting information, and travel confirmations and locators.

Personally identifiable information of individuals, including signatures, dates of birth, social security numbers, as well as similar information regarding individuals, including, but not limited to, signatures, dates of birth, social security numbers, personal email addresses, personal addresses, personal phone numbers, information concerning an employee's leave schedule, virtual meeting credentials, bookings, approvals, reimbursements, and frequent flyer numbers were also withheld.

All of this information "applies to a particular individual" and thus satisfies Exemption 6's threshold analysis. *Wash. Post*, 690 F.2d at 260. The Agency has balanced the public interest— to the extent any exists, *see* Thompson Decl. ¶ XX—and the privacy interests of these private citizens whose information is swept up in the Agency's records, *id.* An "individual's interest in maintaining privacy outweighs the public interest in identifying individuals who have experienced issues with their vehicles." *Id.*; *see also Ctr. for Auto Safety v. NHTSA*, 809 F. Supp. 148, 150 (D.D.C. 1993). Disclosure risks "subjecting the individuals to unwanted intrusion into their experiences and solicitation, harassment, and contact by the media, attorneys, and other interested parties." Thompson Decl. ¶ 29. Disclosure "would foreseeably harm the individual's substantial privacy interest and constitute an invasion of privacy by allowing others to obtain and exploit [personally identifiable information] for commercial or private gain." *Ctr. for Auto Safety*, 809 F. Supp. at 150 "Any further segregation or disclosure of the material withheld under Exemption 6 is reasonably expected to foreseeably harm the substantial privacy interest of the individuals at issue, and the balancing analysis that NHTSA has conducted tilts firmly in favor of nondisclosure." *Id.* Accordingly, Defendants have demonstrated that their Exemption 6 withholdings are appropriate, and the Court should grant summary judgment in their favor.

With respect to the email addresses of employees of other federal executive agencies, Category No. 9 (Ex. 2), these employees have a substantial privacy interest in their individual agency email addresses, particularly in light of a pattern of doxxing, threats, intimidation, and harassment against employees involved in USDS initiatives, identified through the interagency consultation process. *Shurtleff v. United States Env't Prot. Agency*, 991 F. Supp. 2d 1, 18 (D.D.C. 2013) (stating that government employees have "a significant personal interest in preventing the burden of unsolicited emails and harassment"); *Jud. Watch, Inc. v. U.S. Dep't of State*, 306 F. Supp.

3d 97, 116-17 (D.D.C. 2018). Therefore, it is reasonably foreseeable that the release of the email addresses would lead to harassment and intimidation of certain employees. Further, there is no public interest in the email addresses of these employees. Further, the full names of the federal employees are released on these pages, so the public is aware of the identities of the participants in the email exchanges. Releasing their actual email addresses does not offer any further insight into the nature of the communications or of any performance of the agency's statutory duties. The significant privacy interest outweighs the lack of any public interest in these email addresses. *Shurtleff*, 991 F. Supp. 2d at 18 (D.D.C. 2013) ("Exemption 6 allows an agency to withhold personal identifying information, such as email addresses . . . ."). The FCC properly claimed Exemption 6.

### F.  Exemption 7(E)

The FCC withheld one document under Exemption 7(E). Exemption 7(E) permits an agency to withhold information that is "compiled for law enforcement purposes" if, among other reasons, its release "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." *Long v. Immigration & Customs Enforcement*, 149 F. Supp. 3d 39, 48 (D.D.C. 2015) (quoting 5 U.S.C. § 552(b)(7)(E)). Records falling under 7(E) need not be compiled pursuant to a specific investigation. *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002). Indeed, "law enforcement" also entails taking "proactive steps designed to prevent criminal activity and to maintain security." *Pub. Emps. For Envtl. Responsibility v. U.S. Section, Int'l Boundary and Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014) (quoting *Milner*, 562 U.S. at 582 (Alito, J., concurring)). As described on Defendant's *Vaughn* index, the FCC withheld a "detailed explanation of the FCC's system and

solution architecture, as identified by the cover sheet and table of contents included in the production at 003063-003065.

That document entitled "Broadband Data Collection: Architectural and System Design Documentation" would entail the release of a detailed explanation of the FCC's internal IT systems, and its public release would expose the FCC to extreme cybersecurity vulnerabilities and possible infiltration. Ex. 3 at p. 18. Thus, the application of Exemption 7E is proper.

So too here. The document entitled "Broadband Data Collection: Architectural and System Design Documentation" the release of a detailed explanation of the FCC's internal IT systems, and its public release would expose the FCC to extreme cybersecurity vulnerabilities and possible infiltration. Ex. 3 at p. 18. This exemption is proper.

**IV.      The FCC Produced the Reasonably Segregable Information.**

Under FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Just.*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Here, the FCC reviewed the responsive records to determine whether any reasonably segregable information could be released and provided those segregable portions of the record to Plaintiffs. SUMF ¶ 43. The agency's *Vaughn* indexes reflect that the FCC redacted records in part rather than withholding records in full where practical. Exs. 2-3. This included in all cases leaving

contextual information about which parties were communicating, the time and date of the communications, and other non-privileged contextual information. Exs. 2-3. Where the FCC withheld a record in full, it not only offered a detailed explanation as to why the entire record was privileged, it also cited to the communication transmitting the withheld document for additional context and reference. Ex. 2-3. The FCC offered explanations for why it properly applied the relevant exemptions to the responsive records. Ex. 2-3. And, where the FCC realized that it could release certain information or inconsistently redacted information across records, it re-released that information to Plaintiffs with redactions removed. SUMF ¶ 51.

Therefore, the FCC has provided an adequate explanation demonstrating that it released all reasonably segregable information relating to the redactions. *See Bigwood*, 132 F. Supp. 3d at 150-1.

## CONCLUSION

For the foregoing reasons, the FCC respectfully requests that this Court grant summary judgment in its favor.

Dated:  June 3, 2026                    Respectfully submitted,

*/s/ Amanda L. Torres*

AMANDA L. TORRES, D.C. Bar #1562702
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2507

*Attorney for the United States of America*