UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NINA BURLEIGH, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>FEDERAL COMMUNICATIONS<br>COMMISSION,<br><br>  Defendant. | Civil Action No. 25-1268 (ABJ) |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  The FCC received a FOIA request from Plaintiffs on or about February 24, 2025. The FCC assigned the request number FCC-2025-000636. Kristi Thompson Declaration (hereinafter "Thompson Decl.") ¶ 4.

2.  The FOIA request sought: "all documents from October 1, 2024, to the present, concerning the following USDS matters:

    1.  All documents by persons affiliated with or representing USDS relating to access to any records of the FCC including data repository, database, system of records, computer matching program, code base, or other system containing information.

    2.  All documents sent or received by the FCC regarding the deployment of individuals associated or affiliated with USDS.

    3.  All documents pertaining to any past or planned meeting(s) with any Commission employee that included or includes any person or persons affiliated or associated with USDS;

4. All documents relating to USDS received, produced or disseminated by FCC employees.

5. All documents relating to the selection of DOGE Team members by any FCC employee or insertion of any DOGE Team member at the FCC;

6. All documents relating to the hiring of DOGE Team members or any other Schedule C or non-career Senior Executive Service (SES) or Senior Level (SL) employees to be placed within the FCC, including but not limited to the hiring of special government employees;

7. All documents exchanged between any employee of the FCC and any person affiliated with or representing USDS; and

8. All documents from January 1, 2021, to the present, relating to travel by Brendan Carr or the Carr Office to any location or facility of any Elon Musk Affiliated Entity." Decl. ¶ 5.

3. The request did not contain specific search terms. Decl. ¶ 6.

4. This request was ill-defined and overbroad which appears to seek any and all communications between all FCC personnel and individuals "affiliated with or representing USDS." Decl. ¶ 7.

5. The request defined "affiliated with or representing USDS" in a way that would include, but was not limited to, any individual who had previously worked at companies including SpaceX or Tesla; any Special Government Employee who began work with a federal agency on or after January 20, 2025 (irrespective of whether their duties were actually USDS-related); a long list of named individuals with no actual connection to the FCC or how they were affiliated with

USDS; and any others acting under the supervision or at the direction of others described. Decl. ¶ 8.

6. Plaintiffs filed a complaint on April 24, 2025. Decl. ¶ 9.

7. FCC conferred with Plaintiffs in an effort to define the scope of their improperly defined request. Decl. On June 12, 2025, the FCC sent Plaintiffs a narrowing letter explaining its concerns with the clarity and scope of the request and suggested ways to more concretely define 1) the date range, 2) the definition of individuals associated with USDS, and 3) the list of FCC custodians, among other proposals. The parties subsequently discussed these terms on a video call. Decl. ¶ 10-15.

8. While Plaintiffs agreed to drop one subpart as duplicative and exclude all mass recipient filings (such as news clips), the parties could not agree on a reasonable list of custodians or other meaningful limits. Decl. The FCC sent Plaintiffs a second narrowing letter on June 17, 2025 to further address these issues. Decl. Plaintiffs sent a response letter on June 19, 2025 that offered limited narrowing of internal FCC custodians to include all Commissioners and Bureau Chiefs, which still constituted an overbroad subset of individuals not likely to possess responsive records and did not address other fundamental defects in the request the FCC review team had raised, such as the definition of individuals "affiliated with or representing USDS," the undefined terms in the request, or the lack of search terms. *Id*.

9. Plaintiffs claimed that they were not aware of any other email addresses USDS personnel were using, although Plaintiffs' counsel had represented on the prior call that they knew email addresses but would not share them. Decl. ¶ 12. Based on all these communications, it became apparent that the parties were not making progress to reach any reasonable agreement. Decl. ¶ 12.

10. The FCC does not have the technology to conduct agency-wide searches for information without identifying specific custodians' files to be searched. Any agency-wide search would require running separate searches in each employee's electronic file. Decl. ¶ 13.

11. The FCC does not maintain lists of all individuals affiliated with USDS or all Special Government Employees. Decl. ¶ 14.

12. In the absence of a concrete and reasonable subset of identified custodians or search terms, the FCC developed a practical method for conducting the search in a way that was reasonably calculated to lead to responsive records. Decl. ¶ 15.

13. The FCC's initial search began with a request to the Office of Managing Director (OMD), the agency's office that includes the Human Resources staff. The FCC asked OMD to identify any USDS personnel who were detailed to the FCC and provide documentation and communications relating to their onboarding. Decl. ¶ 16.

14. The FCC found three individuals representing USDS who were detailed to the FCC in some form: Tarak Makecha, Jordan Wick, and Jacob Altik (collectively referred to as the "USDS personnel"). Although the FCC originally believed Jacob Altik would be detailed to the FCC and took initial steps to onboard him, including setting up an Outlook account, he was ultimately never fully onboarded and did not engage in substantive work at the FCC. The FCC nevertheless included him as a custodian in its search out of an abundance of caution. Decl. ¶ 17.

15. OMD performed a manual search for records relating to the USDS personnel, including onboarding documents and other relevant communications, which the FCC reviewed and produced. The search included records in the possession of Chief Human Capital Officer Ellen Standiford. Decl. ¶ 18.

16.    The FCC next developed a list of additional custodians, beyond the OMD staff, who were reasonably likely to possess records concerning USDS. The review team developed this list based on the content of the initial documents produced by OMD, as well as through conversations with OMD and other management officials about the scope of USDS action within the FCC. Based on this information, the review team determined that the FCC had limited involvement and communications with USDS members. Decl. ¶ 19.

17.    The FCC implemented a DOGE Team in response to Executive Order 14158, which directed each agency to establish an internal team of at least four employees, typically including a team lead, an engineer, a human resources (HR) specialist, and an attorney. The members of the FCC's DOGE team were: Scott Delacourt, Chief of Staff for the FCC and DOGE team lead; Allen Hill, Chief Information Officer, designated as an engineer given his knowledge about the FCC's IT systems; Ellen Standiford, Chief Human Capital Officer; and Adam Candeub, General Counsel. The FCC also identified Gregory Watson, Chief of Staff to FCC Chairman Carr, as an individual who may have been communicating with the USDS personnel or other USDS staff. The FCC believed that this group of custodians constituted the individuals who were primarily in contact with the USDS personnel and outside USDS staff. Decl. ¶ 20.

18.    Through internal discussions and document review, the FCC determined that USDS had contacted the FCC about onboarding some personnel in February 2025; the USDS personnel were onboarded in mid-March; and that Tarak Makecha and Jordan Wick were only conducting FCC business until April and May of that year, respectively. Decl. ¶ 21.

19.    The scope of their business was limited to the FCC's compliance with Executive Orders implementing cost efficiency and workforce optimization measures, which included reviewing contracts to identify areas of redundancy and overspending. Decl. ¶ 21.

20.     The FCC initiated electronic IT searches for Scott Delacourt, Allen Hill, Gregory Watson, and Adam Candeub ("the FCC custodians"). The FCC did not include Ellen Standiford in this list because she had already manually searched for and provided responsive records. Decl. ¶ 22.

21.     After discussing with custodians, the FCC determined that there were not likely to be any text messages concerning USDS matters. Agency counsel spoke with the Chairman's office and confirmed that neither the Chiefs of Staff nor the Chairman had the phone numbers for the USDS personnel. Decl. ¶ 23.

22.     It is agency policy not to download additional messaging applications on FCC phones (e.g., Signal, WhatsApp). Decl. ¶ 23.

23.     The FCC ran the following searches for the time period of October 1, 2025 to the date of the search, which was conducted on July 22, 2025. Decl. ¶ 24:

- Any email **sent to** Greg Watson, Scott Delacourt, Adam Candeub, and Allen Hill from the following email address or domains:
  - tarak.makecha@fcc.gov
  - jordan.wick@fcc.gov
  - jacob.altik@fcc.gov
  - Emails with domains ending in
    - doge.eop.gov
    - doge.gov
    - usds.gov

- Any emails **sent by or received from** tarak.makecha@fcc.gov, jordan.wick@fcc.gov, and jacob.altik@fcc.gov containing any of the following terms:
  - system
  - systems
  - database
  - databases
  - code base
  - codebase
  - repository
  - repositories
  - K: Drive

- K- Drive
- K – Drive
- K-Drive
- K Drive
- ECFS
- ULS
- CPDS
- ASR
- LMS
- CORES
- Monster
- Genesis
- Paycheck 8
- data
- program
- software
- access

o   The Outlook calendars for tarak.makecha@fcc.gov, jordan.wick@fcc.gov, and jacob.altik@fcc.gov in date format.

o   Any calendar invites/entries for Greg Watson, Scott Delacourt, Adam Candeub, and Allen Hill from the following email address or domains:
- tarak.makecha@fcc.gov
- jordan.wick@fcc.gov
- jacob.altik@fcc.gov
- Emails with domains ending in
  - doge.eop.gov
  - doge.gov
  - usds.gov

24.    After reviewing    the    results    of    these initial IT    searches,    the FCC subsequently pulled  the  entire  Outlook  files  for  all  three  of  the USDS  personnel and reviewed them in their entirety. This means that this search captured any and all communications the USDS personnel had with *any* individuals, inside or external to the FCC, during their tenure. Decl. ¶ 25.

25.     While reviewing the  search  results,  the  review team  noted  that,  because two of the USDS  personnel were primarily employed  at other  federal agencies and  had  merely  been detailed to the FCC, they had been conducting their government business in part using the email

accounts from their home agencies. Therefore, the FCC also conducted the following supplemental search. Decl. ¶ 26:

- o  Any email sent to Greg Watson, Scott Delacourt, Adam Candeub, and Allen Hill from the following email address or domains:
  - ▪ [Tarak Makecha's OPM email address]
  - ▪ [Jordan Wick's GSA email address]

- o  Any calendar invites/entries for Greg Watson, Scott Delacourt, Adam Candeub, and Allen Hill from the following email address or domains:
  - ▪ [Tarak Makecha's OPM email address]
  - ▪ [Jordan Wick's GSA email address]

26.    The review team reviewed the results of these supplemental searches and found that every record returned from that search was duplicative of records already located and reviewed. Decl. ¶ 27.

27.    The review team believed at this point that they had followed all reasonable leads and performed all supplemental searches reasonably calculated to uncover more responsive results. Decl. ¶ 27.

28.    The FCC produced responsive records to Plaintiffs on August 15, 2025; September 15, 2025; November 28, 2025; January 16, 2026; and January 21, 2026. Decl. ¶ 28.

29.    After the January 21 production, the FCC believed it had completed all its productions. At that time, the FCC had processed 3,544 pages of records. Decl. ¶ 29.

30.    The FCC transmitted a *Vaughn* index to Plaintiffs on February 2, 2026. That index reflected that the FCC had withheld 1,580 pages in full under relevant exemptions. Decl. ¶ 30.

31.    When Plaintiffs raised concerns in their Motion to Compel Discovery that there was a text exchange between General Counsel Adam Candeub and one of the USDS team members, the FCC found and produced the entire extant text message conversation between those individuals. Decl. ¶ 31.

32.    The FCC confirmed that no other text messages between General Counsel Adam Candeub and USDS personnel existed. Because no leads appeared indicating the existence of other text messages, and nothing appeared to contradict the prior representations that the agency's Chairman's office did not communicate with USDS via text messages, additional responsive text message conversations are unlikely to exist. Decl. ¶ 31.

33.    After learning that the FCC had inadvertently omitted a search for subpart 8, "[a]ll documents from January 1, 2021, to the present, relating to travel by Brendan Carr or the Carr Office to any location or facility of any Elon Musk Affiliated Entity," from its production through the Motion, the FCC initiated an additional search to rectify this administrative omission. Decl. ¶ 32.

34.    First, the FCC gathered records already made public as part of another FOIA request, which sought "all FCC records including e-mails, attachments, correspondence, reports, or presentations about Commissioner Brendan Carr's trip(s) to Brownsville, Texas to watch SpaceX Starship launches." Decl. ¶ 33.

35.    Second, the Special Assistant to Chairman Carr provided the review team with a list of all the Chairman's travel from January 1, 2021 to the date of the search (February 23, 2026). From that list the FCC identified all of the Chairman's travel to any Elon Musk-affiliated entity, including Starlink, SpaceX, Space Exploration Technologies, Tesla, X Corp, xAI, The Boring Company, or Neuralink. The review team then had the Special Assistant pull all of the travel records from those identified trips. Decl. ¶ 34.

36.    Third, the FCC initiated the following searches for additional responsive records. Decl. ¶ 35:

  o  <u>IT keyword searches:</u> any emails to Chairman Carr from January 1, 2021 to the date of the search (which occurred on February 27):
    ▪  **Search 1:** (trip OR travel OR visit OR flight OR hotel OR invited OR invite OR viewing OR view OR launch) AND

9

(Redmond OR Starbase OR Starlink OR Hawthorne OR SpaceX OR "Space Exploration Technologies" OR Tesla OR "X Corp" OR "X.AI" OR "xAI" OR "The Boring Company" OR TBC OR Neuralink)

- **Search 2**: from the domain spacex.com OR tesla.com OR x.com OR x.ai OR boringcompany.com OR neuralink.com

o   Chairman Carr's Outlook calendars from January 1, 2021, until the date of the search (which occurred on March 4, 2026). The team manually searched these items for responsive items.

o   Confidential Assistant Drema Johnson's Outlook mailbox and calendars from January 1, 2021 to the date of the search (March 4, 2026). The team manually searched for the terms: Redmond, Starbase, Starlink, Hawthorne, Texas, SpaceX, Space Exploration Technologies, Tesla, X Corp, X.AI, The Boring Company, TBC, Neuralink, Elon, Musk, El Segundo, and etravelservices@cwtsato.com.

37.     Fourth, the FCC requested the Office of the Chairman to search its records and identify any staff who may have attended responsive trips. Gregory Watson was the only member of Chairman Carr's staff who traveled to any Musk-affiliated entity during the relevant time period. Subsequently, the review team obtained Mr. Watson's travel records from E2. The review team performed the following additional IT keyword search in Mr. Watson's Outlook. Decl. ¶ 36:

o       All emails containing the following terms: (trip OR travel OR itinerary OR flight OR rental OR tour OR visit) **AND** (Redmond OR Seattle OR Washington OR PNW OR Northwest OR Starlink OR SpaceX OR "Space Exploration Technologies") from April 1, 2021 – July 31, 2021

o       All emails containing: (trip OR travel OR itinerary OR flight OR rental OR tour OR visit) **AND** ("El Segundo" OR Millbrae OR "Los Angeles" OR California OR Seattle OR Redmond OR "X Corp" OR Starlink OR SpaceX OR "Space Exploration Technologies" OR "X.AI") from March 1, 2024 to June 30, 2024

o       All calendar entries from April 1, 2021 – July 31, 2021, and March 1, 2024 – June 30, 2024

o       All emails from January 1, 2021 to the date of the search (which was performed on March 25, 2026), to or from any email address ending in: spacex.com OR tesla.com OR x.com OR x.ai OR boringcompany.com OR neuralink.com

38.    After reviewing the results of all searches, the FCC believed that they had followed all reasonable leads to uncover responsive records. Decl. ¶ 37.

39.    The FCC made its final supplemental production on April 30, 2026. That production was 584 pages long. The FCC also withheld two pages of records in full. The FCC transmitted a supplemental *Vaughn* index on May 22, 2026. Decl. ¶ 38.

40.    Plaintiffs' counsel has maintained that the FCC failed to produce all responsive records. The FCC, through its counsel, attempted to confer with Plaintiffs. Decl. ¶ 39.

41.    The parties met on March 26, 2026, but Plaintiffs were unable to identify what they believed was missing. Instead, they yet again demanded to debate the sufficiency of the searches and debate the search terms employed. The FCC reminded Plaintiffs' counsel that the sufficiency of the searches would be the subject of the motion for summary judgment and offered to conduct additional searches if Plaintiff could identify what was missing. Decl. ¶ 39.

42.    When pressed on what was missing, Plaintiffs' counsel identified records related to the drafting of Project 2025. This was beyond the scope of this FOIA request. The FCC has previously responded to a FOIA request on the issue of Chairman Carr's participation in Project 2025, which is publicly available on the FCC's Reading Room website. Those records reflect that then-Commissioner Carr received approval to participate in that project in his personal capacity through the FCC's ethics office, and that discussions regarding his participation occurred before the date range specified in Plaintiffs' FOIA request. Decl. ¶ 40.

43.    The FCC recommended release of all reasonably segregable, non-exempt information from records responsive to Plaintiffs' FOIA request and has properly withheld information pursuant to FOIA exemptions 5 U.S.C. § 552 (b)(2), (b)(3)(A), (b)(4), (b)(5), (b)(6), and (b)(7)(E). Decl. ¶ 41.

44.    The FCC processed a total of 4,130 pages of responsive records for this request. The FCC withheld sixteen individual documents, totaling 1,592 pages in full under one or more applicable FOIA exemptions. The FCC produced 853 pages containing partial redactions. The FCC produced 1,685 pages without redactions. Decl. ¶ 42.

45.    For all of the records, the review team conducted a careful review to segregate exempt information from non-exempt information within a requested record. If a document contained sensitive or protected material, the review team redacted the restricted portions and produce the remaining, non-exempt text. Specifically, the review team redacted portions of records under Exemption 2; Exemption 5; Exemption 4; and Exemption 6. For the documents in which the review team determined that the record was not segregable for non-exempt material, it withheld the document in full. The review team withheld records under Exemption 2; Exemption 3(A); Exemption 5; and Exemption 7(E). Decl. ¶ 43.

46.    The FCC produced an initial *Vaughn* index to Plaintiffs on February 2, 2026. The FCC produced a supplemental *Vaughn* index on May 22, 2026. Exs. 2 and 3 to the FCC's Motion for Summary Judgment. Decl. ¶ 44.

47.    The review team determined that, as to pages that were produced with partial redactions, it was most appropriate to organize the *Vaughn* indexes by category, because there was a high volume of records produced and much of the material addressed the same or similar topics. Decl. ¶ 45.

48.    The *Vaughn* indexes included fifteen categories of information organized by the topic or type of redacted exempt material. Within each category, the indexes specified which exemption or exemptions applied, and the Bates numbers of each page to which that exemption applied. The index included a detailed description including the specific nature of the redacted

material for each exemption within each category. The *Vaughn* indexes provided sufficient detail and information about the redacted, exempt material to establish the basis for the exemption without revealing exempt information. Decl. ¶ 46.

49.     For records that were withheld in full, the *Vaughn* indexes did not take a categorical approach, but offered a document-by-document explanation for each withholding, including a description and explanation of the asserted exemption; the title of the document withheld; the Bates number of the communication to which it was attached; and the date of the transmitting communication. The *Vaughn* indexes provided sufficient detail and information about the redacted, exempt material to establish the basis for the exemption, without revealing exempt information. Decl. ¶ 47.

50.     Within each description for documents withheld and/or redacted, the review team explained why disclosure of that material would result in foreseeable harm. Decl. ¶ 48.

51.     Where the review team later determined it could remove some of the redactions it had initially applied, it re-issued that material to Plaintiffs with those redactions removed on January 16, 2026. Decl. ¶ 49.

52.     Plaintiffs have not challenged the sufficiency of any specific withholdings or redactions. Decl. ¶ 50.

53.     Each step in the processing of Plaintiffs' request has been consistent with the FCC's procedures. Decl. ¶ 110.

**RELEVANT FOIA EXEMPTIONS**

**EXEMPTION 2**

54.     As described in the Agency's Exemption 2 *Vaughn* index Ex. 2 and the Thompson Declaration, the Agency released in part, communications regarding the onboarding and offboarding of personnel. Decl. ¶¶ 51; 64.

55.     The information redacted on Bates numbers: 000003, 000009, 000010, 000011, 000013, 000014, 000015, 000019, 000021, 000033 and 000034 represent internal agency regarding onboarding practices for DOGE team members to the FCC, including building visitor security protocols; badging procedures and requirements; computer access procedures; ethics clearance procedures; required forms and documentation to be submitted; and required trainings to be completed. Decl. ¶¶ 53; 60.

56.     Disclosure of this information would undermine the efficient functioning of the agency's onboarding processes and compromise FCC security. Decl. ¶ 61.

57.     As described in the Agency's Exemption 2 *Vaughn* index and the Thompson Declaration, the Agency withheld in full, FCC Data Files PP04CY25 at Bates numbers 003217–3246. Decl. ¶ 106.

58.     This record reflects the internal personnel rules and practices of the FCC. This is a chart that lists all FCC employees and personnel information, including: title, grade/step, job series code, salary, start date (EOD), Bargaining Unit status, date of appointment (NTE), Bureau/Office/Division, duty station location. Decl. ¶ 106.

59.     Disclosure of the agency's internal classifications would undermine the efficient functioning of the agency's internal personnel recording system. Furthermore, disclosure of this information could also undermine the FCC's enforcement activities by revealing information used

14

to identify the designations and positions of particular field agents in the Enforcement Bureau. Decl. ¶ 106.

## EXEMPTION 3(A)

60.    As described in the Agency's Exemption 3(A) *Vaughn* index and the Thompson Declaration, the Agency withheld in full, the Confidential Financial Disclosure Report at Bates numbers: 000080–000090. Decl. ¶¶ 52; 95.

61.    This document contains the confidential financial disclosure report for Jordan Wick, one of the DOGE team members onboarded to the FCC. Decl. ¶ 95.

62.    This information is prohibited from release under 5 U.S.C. § 13109(a)(2), which provides that any information required to be provided by an individual as part of a financial disclosure report prescribed by a supervising ethics office shall be confidential and shall not be disclosed to the public. Decl. ¶ 95.

## EXEMPTION 4

63.    As described in the Agency's Exemption 4 *Vaughn* index Ex. 2 and the Thompson Declaration, the Agency released in part, communications regarding contract review initiative. Decl. ¶¶ 53; 71-72.

64.    The redacted information redacted on Bates number 003292–003372 are confidential commercial or financial information obtained from third party vendors associated with various agency contracts. The redacted information consists of specific unit pricing, i.e., cost per license, and quantity information, i.e., number of licenses. Pricing information is commercial in nature, and each vendor actually and customarily keeps this information confidential. Unit quantity information must similarly be redacted because it would effectively reveal the unit price when taken together with the publicly available total funding amount of each contract. Decl. ¶ 72.

65.     Disclosure of this information would harm the contractor's commercial interests by providing an advantage to competitors whose similar unit pricing information is not disclosed. Further, disclosure would impede the FCC's ability to obtain similar information from these or other vendors. Decl. ¶ 72.

### EXEMPTION 5

66.     As described in the Agency's Exemption 5 *Vaughn* index and supplemental *Vaughn* index (Exs. 2 & 3) and the Thompson Declaration, the Agency released in part or withheld in full, attorney-client privileged and inter- and intra-agency predecisional deliberative communications. The discussions include advice and recommendations, including, but not limited to: legal research; requests for initial impressions and updates; opinions and impressions; and document drafts. Decl. ¶¶ 55; 56; 57; 61; 63; 66; 67; 68; 69; 71; 72; 74; 76; 78; 86; 90; 92; 94; 97; 98; 99; 100; 101; 102; 103; 104; 105; 106; 109.

67.     Disclosure of this material would create a chilling effect on the staff at the FCC and other federal executive agencies from frankly and candidly proposing ideas and exchanging views while planning and collaborating, as well as other presidential directives, which will degrade the quality of agency decision-making. *Id*.

### EXEMPTION 6

68.     As described in the Agency's Exemption 6 *Vaughn* index and supplemental *Vaughn* index and the Thompson Declaration, the Agency redacted personally identifiable information of individuals, including signatures, dates of birth, social security numbers, as well as similar information regarding individuals, including, but not limited to, signatures, dates of birth, social security numbers, personal email addresses, personal addresses, personal phone numbers,

16

information concerning an employee's leave schedule, virtual meeting credentials, bookings, approvals, reimbursements, and frequent flyer numbers. Decl. ¶¶ 43; 57; 79; 81; 83; 86.

69.     There is a significant privacy interest in this sensitive personal information because its release would foreseeably result in substantial personal disruption, including harassment, identity theft, or fraud. Further, there is no public interest in the personal information of individuals, which sheds no additional light on the conduct of agency business or government activity. The significant privacy interest outweighs the lack of any public interest in this information. *Id*.

70.     With respect to the email addresses of employees of other federal executive agencies, Category No. 9 (Ex. 2), these employees have a substantial privacy interest in their individual agency email addresses, particularly in light of a pattern of doxxing, threats, intimidation, and harassment against employees involved in USDS initiatives, identified through the interagency consultation process. Therefore, it is reasonably foreseeable that the release of the email addresses would lead to harassment and intimidation of certain employees. Further, there is no public interest in the email addresses of these employees. The full names of the federal employees are released on these pages, so the public is aware of the identities of the participants in the email exchanges. Releasing their actual email addresses does not offer any further insight into the nature of the communications or of any performance of the agency's statutory duties. The significant privacy interest outweighs the lack of any public interest in these email addresses. Decl. ¶ 80-1.

**EXEMPTION 7(E)**

71.     As described in the Agency's Exemption 7(E) *Vaughn* index and supplemental *Vaughn* index and the Thompson Declaration, the Agency withheld in full the attachment entitled "Broadband Data Collection: Architectural Design Documentation" at Bates numbers 003066– 3133. Decl. ¶¶ 59; 108.

72.     This non-public document is a detailed explanation of the FCC's system and solution architecture, as identified by the cover sheet and table of contents included in the production at 003063–003065. This document was compiled in part to demonstrate system compliance with FCC security protocols, including explanations of the system's security controls. Its release would reasonably lead to circumvention of the law because it is a detailed explanation of the FCC's internal IT systems, and its public release would expose the FCC to extreme cybersecurity vulnerabilities and possible infiltration. Decl. ¶ 107.

*    *    *

Dated:  June 3, 2026                          Respectfully submitted,

*/s/ Amanda L. Torres*

AMANDA L. TORRES, D.C. Bar #1562702
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2507

*Attorney for the United States of America*