UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NINA BURLEIGH,
FREQUENCY FORWARD

        Plaintiffs,

FEDERAL COMMUNICATIONS COMMISSION

        Defendant.

) 
) 
) 
) 
) 
) Civil Action No. 25-1268 (ABJ)
) 
) 
) 
) 

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Arthur V. Belendiuk
D.C. Bar No. 336768
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W., #301
Washington, D.C. 20016
(202) 363-4559

Dated: June 25, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

THE FCC'S SEARCH FOR DOCUMENTS RESPONSIVE TO PLAINTIFFS'
FOIA REQUEST WAS INADEQUATE AND MADE IN BAD FAITH.........................3

    1. The FCC Did Not Search for the Records Plaintiffs Requested, Instead It
    Altered the Search Criteria Without Notice to Plaintiffs or the Court. ...............3

        a. DOGE and the FCC Have Engaged in a Campaign to Conceal the
        True Nature of DOGE's Activities Within the FCC. The Case of Tarak
        Makecha, the "Software Engineer" Who Isn't...........................................7

        b. Chairman Carr's Signal Account. DOGE and the FCC Staff Routinely
        Communicate Via Text, Signal and Personal Electronic Devices. The
        Defendant Did Not Search for Electronic Messages...................................8

        c. Despite Plaintiffs Objections, the FCC Limited Its Search to Emails
        with FCC, DOGE and GSA domains.......................................................13

        d. The Travel Documents Provided by the Commission Contain Nothing
        Related to Starlink...............................................................................15

ARGUMENT.................................................................................................................17

CONCLUSION..............................................................................................................21

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986)....................................................................................18

*Authors Guild v. NEH*, No. 25-cv-3923 (CM), 2025 U.S. Dist. LEXIS 262136,
(S.D.N.Y. Dec. 18, 2025)...................................................................................10

*Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527, 395 U.S. App. D.C. 155
(D.C. Cir. 2011)..............................................................................................18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)..........18

*Dep't of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Assn.*,
532 U.S. 1, 7-8, 121 S. Ct. 1060, 149 L. Ed. 2d 87 (2001) ................................................17

*DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755, 109 S. Ct. 1468,
103 L. Ed. 2d 774 (1989)...................................................................................19

*Gun Owners of Am., Inc. v. FBI*, 594 F. Supp. 3d 37 (D.D.C. 2022)...............................4, 6

*Hamdan v. United States DOJ*, 797 F.3d 759, 769-70 (9th Cir. 2015)...............................17

*Heartland All. for Hum. Needs & Hum. Rts. v. USCIS*, 406 F. Supp. 3d 90, (D.D.C. 2019).....19

*Heritage Found. v. DOJ*, 743 F. Supp. 3d 29, 35 (D.D.C. 2024)....................................19

*In re FCC Reaffirms Decision to Reject Starlink Application for Nearly $900 Million in
Subsidies*, 38 FCC Rcd 1220, 12205 (2023)..............................................................16

*In the Matter of Space Exploration Holdings, LLC; Request for Deployment and Operating
Authority for the SpaceX Gen2 NGSO Satellite System*, 2026 FCC LEXIS 77, (Space Bureau,
Jan. 9, 2026)....................................................................................................3

*Larson v. Dep't of State*, 565 F.3d 857, 862, 385 U.S. App. D.C. 394 (D.C. Cir. 2009)...........19

*Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1248
(11th Cir. 2008)...............................................................................................21

*Miller v. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985)....................................21

*Morley v. CIA*, 508 F.3d 1108, 1114, 378 U.S. App. D.C. 411 (D.C. Cir. 2007)....................21

*Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996)................................................................19

*Pratt v. Webster*, 218 U.S. App. D.C. 17, 673 F.2d 408, 413 (D.C. Cir. 1982).....................17

*Pub. Emps. for Envtl. Resp. v. EPA*, 314 F. Supp. 3d 68, 76 (D.D.C. 2018)...........................6

*Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)....................18

*Shapiro v. CIA*, 170 F. Supp. 3d 147, 155 (D.D.C. 2016)........................................................6

*Transgender Law Ctr. v. Immigration & Customs Enf't*, 46 F.4th 771 (9th Cir. 2022).......18, 21

*Valencia-Lucena v. United States Coast Guard*, 336 U.S. App. D.C. 386,
180 F.3d 321 (1999)..................................................................................................22

*Watkins L. & Advoc., PLLC v. DOJ*, 78 F.4th 436, 442, 463 U.S. App. D.C. 1
(D.C. Cir. 2023)........................................................................................................19

*Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351, 227 U.S. App. D.C. 253 (D.C. Cir. 1983).....21

**Statutes**

5 U.S.C. § 552(a)(4)(B))...........................................................................................19

**Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................................6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NINA BURLEIGH,<br>FREQUENCY FORWARD<br><br>Plaintiffs,<br><br>FEDERAL COMMUNICATIONS COMMISSION<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) Civil Action No. 25-1268 (ABJ)<br>)<br>)<br>)<br>) |

## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Nina Burleigh and Frequency Forward, hereby oppose the Federal Communications Commission's ("FCC") Motion for Summary Judgment ("Motion").

## PRELIMINARY STATEMENT

On November 13, 2024, President-elect Donald Trump, at the urging of Elon Musk ("Musk") announced the formation of DOGE[1] and placed Musk at its head.[2] Musk oversaw DOGE from January 20, 2025, until May 28, 2025. Musk is a trillionaire and the largest contributor to the Republican Party.[3] Musk holds a 42% ownership stake and almost 79% of the

---

[1] Also known as the U.S. DOGE Service ("USDS").

[2] Colleen Long & Jill Colvin, *Trump says Musk, Ramaswamy will form outside group to advise White House on government efficiency*, AP News (Nov. 12, 2024), https://apnews.com/article/donald-trump-president-elon-musk-vivek-ramaswamy-2f0f76bb6440231f2504b77cb117d988.

[3] Musk donated more than $291 million to Republican candidates, political action committees and other outside spending organizations in the 2024 election cycle. Meyers, David, *Elon Musk tops list of 2024 political donors, but five others gave more than $100 million* (March 26, 2025) https://www.opensecrets.org/news/2025/03/elon-musk-tops-list-of-2024-political-donors-but-six-others-gave-more-than-100-million

voting power of Space Exploration Holdings, LLC ("SpaceX").[4] Starlink, a wholly owned subsidiary of SpaceX, is regulated by the FCC. According to a report published by the Permanent Subcommittee on Investigations Minority Staff, Musk through DOGE enriched his companies and himself by using his governmental authority to evade oversight, derail investigations, and make litigation disappear.[5] Since President Trump has taken office, the FCC, headed by Chairman Brendan Carr, has acted favorably on several Starlink initiatives.[6] For example, during this period, the FCC opened an investigation against SpaceX competitor EchoStar, which holds satellite licenses coveted by SpaceX.[7] When EchoStar agreed to sell its satellite frequencies to Starlink, Carr dismissed the investigation.[8] The FCC granted a waiver for SpaceX to provide satellite service directly from orbit to smartphones, over the objection of cell network providers who say the waiver will deteriorate mobile network service for many.[9] Most recently, the FCC's Space Bureau, over the objections of various parties, authorized SpaceX to

---

[4] Maidenberg, Micah, *Elon Musk Borrowed $1 Billion From SpaceX in Same Month of Twitter Acquisition* (Sept. 5, 2023) *Wall Street Journal* https://www.wsj.com/business/elon-musk-supacex-loan-269a2168;

[5] https://www.hsgac.senate.gov/wp-content/uploads/2025-04-27-Minority-Staff-Memorandum-Elon-Musk-Conflicts.pdf

[6] See, e.g. Kang, Cedilia, *How Elon Musk's Friendship With the F.C.C. Smooths the Way for SpaceX's I.P.O.* (June 8, 2026) *The New York Times* https://www.nytimes.com/2026/06/08/technology/elon-musk-brendan-carr-fcc-spacex.html?unlocked_article_code=1.olA.bp1Z.rQv_0sCxwxaK&smid=url-share

[7] SPECIAL INTERESTS OVER THE PUBLIC INTEREST: ELON MUSK'S 130 DAYS IN THE TRUMP ADMINISTRATION https://www.warren.senate.gov/imo/media/doc/130_days_of_elon_musk_report.pdf

[8] DeSelding, Peter, *And just like that: FCC Chairman drops investigation into EchoStar licenses after spectrum sales to AT&T, SpaceX*, (Sept. 9, 2025) Space Intel Report https://www.spaceintelreport.com/and-just-like-that-fcc-chairman-drops-investigation-into-echostar-licenses-after-spectrum-sales-to-att-spacex/

[9] See, n. 6 *supra.*

launch an additional 7,500 satellites and granted SpaceX several material waivers of the FCC's rules.[10]

On February 24, 2025, Plaintiffs filed a Freedom of Information Act ("FOIA") request with the FCC. ECF No. 1 at 12–18. Plaintiffs' FOIA request seeks information concerning DOGE's activities with the FCC, which are at the heart of a debate concerning potential conflicts of interest between Musk and DOGE as government regulators, and Musk's SpaceX, including Starlink, as a regulated entity seeking licenses and other authorizations from the FCC.

The evidence strongly suggests that Musk bought his way into the White House and to obtain his position as the de-facto head of DOGE, and that he had used his government authority and access to information to earn huge profits for himself and his companies. Plaintiffs' FOIA request seeks documents that shed light on the relationship between the FCC, Musk as regulator and Musk and his companies as regulated entities.

## THE FCC'S SEARCH FOR DOCUMENTS RESPONSIVE TO PLAINTIFFS' FOIA REQUEST WAS INADEQUATE AND MADE IN BAD FAITH.

### 1. The FCC Did Not Search for the Records Plaintiffs Requested; Instead, It Adopted Unresponsive Search Criteria Without Notice to Plaintiffs or the Court.

The Plaintiffs filed their FOIA request on February 24, 2025. Soon after Plaintiffs filed their Complaint, on June 3, 2025, Defendant filed a motion seeking a thirty-day extension of time. ECF No. 6. One of the stated reasons for the extension request was "for undersigned counsel to confer with the agency and with Plaintiff regarding any efforts to narrow the FOIA request to allow for a more timely resolution of this action." ECF No. 6, para. 4. In its Reply Defendant threatened that

---

[10] *In the Matter of Space Exploration Holdings, LLC; Request for Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System*, 2026 FCC LEXIS 77, (Space Bureau, Jan. 9, 2026)

> if Plaintiffs refuse to narrow, Defendant would seriously consider filing a partial motion to dismiss. See id.[11] ("[A] motion under Rule 12(b)(6) is the appropriate vehicle for determining whether a plaintiff's request reasonably describes the records sought[.]"). But by extending Defendant's deadline for responding to the Complaint, the parties will have more time to confer on this issue and potentially reach an agreement that cures this flaw and makes motions practice unnecessary. Granting the extension could thus conserve both the Court's and the parties' resources.

ECF No. 8, para. 2. On June 5, 2025, the Court issued an Order, which inter alia, required the parties to "meet and confer in an effort to narrow the scope of plaintiff's request and prioritize the categories of documents to be produced." On June 12, 2025, the FCC sent a letter proposing to narrow the scope of the FOIA request. The parties met on June 13, 2025, to discuss limiting the scope of the FOIA request. As set forth in the Joint Status Report, Plaintiffs made several material concessions. ECF No. 9.

On June 19, 2025, Plaintiffs sent Defendant a detailed response to its narrowing letter, explaining why the FCC's proposal was unworkable and offering significant concessions as to the scope of the FCC's search. Ex. 1 hereto. In its letter, Plaintiffs stated,

> The FCC asks that its search be limited to doge.eop email addresses. This would narrow the scope to such a degree that otherwise producible documents under FOIA would not be provided. It would exclude all emails from individuals who work or have worked for DOGE but have not been assigned or have not used their DOGE emails exclusively. It would exclude all DOGE related communications from the FOIA request start date of October 1, 2024, through at least January 20, 2025, the date DOGE "officially" came into being.

> Significantly, the FCC has not represented that it and its personnel communicated with individuals associated with DOGE only through the official doge.eop email address. As we pointed out at our recent meeting with you and FCC counsel, you have given Plaintiffs no assurance that all individuals representing DOGE/USDS before or at the FCC had doge.eop email addresses

---

[11] Defendant cited, *Gun Owners of Am., Inc. v. FBI*, 594 F. Supp. 3d 37, 42 (D.D.C. 2022).

> or used them exclusively in their contacts with the agency. Your letter states that "The FCC would be willing to consider searching for communications from additional email domains if provided with examples identifying the additional domains to be searched and demonstrating why searching those domains may lead to responsive records." This is an unreasonable request, as Plaintiffs have no way of knowing who such individuals are or their means of communicating with the FCC. This knowledge resides with the FCC and its managers, who can easily identify the DOGE/USDS representatives and any email or text contacts with the covered senior FCC officials.

The FCC never replied to this letter. Nor did the FCC engage in further discussions to limit the scope of Plaintiffs' FOIA request. On July 2, 2025, the Court issued a Minute Order, which stated in pertinent part, "Defendant must file a dispositive motion or, in the alternative, a report setting forth the schedule for the completion of its production of documents to plaintiff, on or before July 23, 2025." On July 23, 2025, Defendant filed a Status Report (ECF No. 11) in which it neither provided a schedule for compliance nor filed a dispositive motion. Defendant did not file a motion seeking to limit the scope of the FOIA request or to dismiss the FOIA request. Instead, the FCC, without informing the Plaintiffs or the Court, created its own set of criteria, which omitted key media and personnel covered by the request.[12] On March 26, 2026, at a Court ordered conference with the Defendant, the FCC attorney could not articulate the search criteria the agency had used in its search for responsive documents. Concerning this meeting, the FCC's declaration claims, "Plaintiffs were unwilling to identify what they believed was missing. Instead, they yet again demanded to debate the sufficiency of the searches and debate the search terms employed." Declaration of FCC attorney Kristi Thompson, Decl. ¶ 9. The FCC was asking Plaintiffs' counsel to identify what documents were missing, when the agency could not, after it had produced most of the documents, articulate where or for what it had searched.

---

[12] See e.g. Statement of Undisputed Material Facts ("SUMF") at ¶ 12.

Defendant's FOIA search for documents was made in bad faith. The Defendant by unilaterally reframing Plaintiffs' FOIA request and by refusing to abide by the unambiguous requirement that it either produce the documents requested or file a 12(b)(6) motion[13] has wasted a year of the Court's time and frustrated Plaintiffs' efforts to timely review critical records.

Plaintiffs' request was narrowly drafted and "reasonably described" the documents it was seeking: it is limited to identified senior FCC officials, to specific dates and individuals, i.e. those associated with DOGE. *See, e.g., Shapiro v. CIA*, 170 F. Supp. 3d 147, 155 (D.D.C. 2016); *Pub. Emps. for Envtl. Resp. v. EPA*, 314 F. Supp. 3d 68, 76 (D.D.C. 2018). However, FOIA does not require every request to be precisely described. After all, "FOIA requesters are frequently in no position to know how an agency classifies its documents or what terminology the agency might have used—that is often why they are making a request in the first place." *Gun Owners of Am., Inc. v. FBI*, 594 F. Supp. 3d 37, 47 (D.D.C. 2022). This is especially true in this case as discussed *infra*, where the FCC and DOGE members used personal emails and communicated through private text messages and the Signal app.

Plaintiffs' FOIA request focused on two critical issues. First, Plaintiffs seek information concerning DOGE's activities at the FCC. Second, Plaintiffs want to better understand how Musk could serve as regulator while simultaneously being regulated by the FCC. As Plaintiffs wrote in their FOIA request,

> SpaceX is an FCC regulated entity. It requires FCC approval to launch satellites and to operate on assigned frequencies. As the head of USDS, Musk has taken on the role of a regulator. Musk's dual role as head of USDS and SpaceX creates a conflict of interest. Based on information and belief, Musk has USDS personnel embedded at the FCC. It is unlikely that Musk can under federal law remain head of USDS as the single majority

---

[13] Fed. R. Civ. P. 12(b)(6).

shareholder of an FCC regulated entity. His conflicts of interest appear to be unmanageable.

The Defendant has provided a paucity of information concerning the activities of DOGE within the FCC and no information concerning the activities of Musk himself as the simultaneous head of USDS and SpaceX.

In its June 19, 2025, letter, Plaintiffs agreed to limit their search to the offices of the three FCC commissioners and the FCC bureau chiefs. The FCC has seven bureaus, Consumer & Government Affairs, Enforcement, Media, Public Safety & Homeland Security, Space, Wireless Telecommunications and Wireline Competition. Did the FCC search for documents concerning DOGE in any of the commissioners' offices? Except for a cursory search of Chairman Carr's files, it did not. Did it search for documents concerning DOGE in any of the bureau chief's files? It did not. Did the FCC search for text messages? Except for producing one set of text messages identified by the Plaintiffs, it did not. Did it search for Signal and other electronic messages between the FCC staff and DOGE? It did not. Did it search private emails used for government business? It did not. Did its search include Musk? It did not.

### a. DOGE and the FCC Have Engaged in a Campaign to Conceal the True Nature of DOGE's Activities Within the FCC. The Case of Tarak Makecha, the "Software Engineer" Who Isn't.

DOGE has operated under a high degree of operational secrecy, avoiding traditional federal transparency and public records requests. The case of Tarak Makecha is instructive. Makecha, along with Jordan Wick, and Jacob Altik, was identified as one of three individuals representing USDS who were detailed to the FCC. See SUMF at ¶ 14. In a letter to FCC General Counsel Adam Candeub, Makecha claims that he is a "Software Engineer." See Ex. 2 Bates 01. His background is in finance, not software engineering. According to his LinkedIn profile he is a

graduate of the London School of Economics and the Texas McCombs School of Business. [14]

From 2018 to 2019 he worked for Tesla alternatively as Global Finance Lead; Chief of Staff, North America Sales & Delivery; and Head of Strategic Planning. At Flexport, he was Global Head of Economic Research and Business Development. Until January 2025, he was SkySafe's Chief Financial Officer. Makecha's LinkedIn profile states that he is currently working as a vice president at Valor Equity Partners. Valor has a close relationship with Elon Musk and his companies. It sells shares to investors in Musk's private companies – particularly SpaceX, xAI, Neuralink, and The Boring Company. [15] In addition, Valor invests or has invested in a number of companies that have been touted by Chairman Carr or his immediate family and that have interests at the FCC. [16] These include Anduril and Palantir. [17] Simply stated, whatever his skill set, Makecha is not a software engineer. Yet, no resume, curriculum vitae, or any similar background information was provided by the Commission for Makecha even though that is required as part of the onboarding and clearance process. It is not clear why DOGE and/or Makecha chose to conceal the true nature of his deployment to the FCC. What is obvious is that DOGE and/or the

---

[14] https://www.linkedin.com/in/tarakmakecha/

[15] Susan Pullman, Corrie Driebusch & Becky Peterson. *"A Side Hustle for Friends of Musk: Selling Access to Stakes in His Private Companies"* The Wall Street Journal (April 24, 2025) https://www.wsj.com/business/elon-musk-friends-private-company-access-eb93ba05?mod=Searchresults_pos7&page=1

[16] See James, Meg, *How Trump's FCC Chairman is Stoking the Culture Wars*, L.A. Times, (April 28, 2025), https://www.latimes.com/entertainment-arts/business/story/2025-04-28/trump-fcc-brendan-carr-upsets-media-status-quo (noting that Chairman Carr's wife was hired by Palatir in early 2025 to serve as that company's head of global public policy); see also Federal Communications Commission, Unleashing American Drone Dominance, Press Release, available at https://docs.fcc.gov/public/attachments/DOC-420531A1.pdf (containing statement of Chairman Carr praising Andruil Industries' drone and counter-drone technologies while simultaneously calling for deregulation).

[17] See Valor Equity Partners website, available at https://www.valorep.com/ (viewed June 19, 2026).

FCC were not candid concerning Makecha's true purpose for being delegated to the FCC. The public does not know why he was delegated to the FCC. More importantly, the public does not know what his duties were or his activities at the FCC. One thing is certain, Makecha was not writing code.

### b. Chairman Carr's Signal Account. DOGE and the FCC Staff Routinely Communicate Via Text, Signal and Personal Electronic Devices. The Defendant did not Search for Electronic Messages.

Plaintiffs' FOIA request defines documents to include,

> messages or communications sent through personal electronic devices or accounts in the course of their work, including but not limited to: email accounts hosted by non-governmental service providers (including but not limited to Proton Mail, Gmail, and services provided by commercial employers such as SpaceX); non-governmental cell phones; non-governmental laptops; non-governmental accounts with messaging apps (including but not limited to iMessage, Signal, WhatsApp, Slack, and Microsoft Teams).

ECF No. 1 at 12–18. Except for one text message, and a handful of Microsoft Teams messages, these types of documents have not been produced. However, the evidence demonstrates that they exist and should have been produced.

The FCC did not search for text messages, "After discussing with custodians, the FCC determined that there were not likely to be any text messages concern USDS matters." SUMF at ¶ 21. When Plaintiffs pointed out that one of the emails Defendant produced refers to a text message, the FCC produced that message and only that message.[18] It then claimed, without searching there were no other text messages.

> The FCC confirmed that no other text messages between General Counsel Adam Candeub and USDS personnel existed. Because no leads appeared indicating the existence of other text messages, and nothing appeared to contradict the prior representations that the

---

[18] See Ex. 2 Bates 002558, email from Adam Candeub to Tarak Makecha, March 13, 2025.

agency's Chairman's office did not communicate with USDS via text messages, additional responsive text message conversations are unlikely to exist. Decl. ¶ 31.

The declaration further states,

> Agency counsel spoke with the Chairman's office and confirmed that neither the Chiefs of Staff nor the Chairman had the phone numbers for the USDS personnel. It is agency policy not to download additional messaging applications on FCC phones (e.g., Signal, WhatsApp). Decl. ¶ 21.

It is also agency policy not to conduct agency business on personal devices. Yet we know that DOGE personnel routinely conducted business on their personal phones using text messages, especially the Signal app. In *Authors Guild v. NEH*, a case involving DOGE, the Court found that agency records were not complete and that the agency acted in bad faith. The Court stated, "It is well-settled that courts may authorize extra-record discovery where plaintiffs make a showing of bad faith or improper behavior, or where other "unusual circumstances" demonstrate that the record before the court is insufficient to permit meaningful judicial review." *Authors Guild v. NEH*, No. 25-cv-3923 (CM), 2025 U.S. Dist. LEXIS 262136, at *30-31 (S.D.N.Y. Dec. 18, 2025). The Court ordered depositions taken of DOGE employees. The video depositions were made public. All the deponents say the same thing, DOGE personnel relied heavily on Signal. The deposition of Justin Fox is typical.[19]

> Q. Okay. Thank you. And how – you said you were communicating with them via Signal?
>
> A. Signal.
>
> Q. And nothing else besides Signal?
>
> A. No.
>
> ....

---

[19] Excerpt of deposition of Justin Fox, *Authors Guild v. NEH*, Case 1:25-cv-03923-CM, USDC Southern District of New York. Ex. 3, hereto.

10

Q. Okay. And then once you were hired by the government, did you migrate all of those communications to your government phone?

MS. DOUD: Objection.

A. With those individuals, no.

Q. Okay. So you were still communicating with Nate Cavanaugh, Ethan Shaotran, and the other two on your personal phone after being hired. Is that right?

A. Yes.

Q. Okay. And did you do anything to search those communications in response to any of those requests that we've gone through from your subpoena?

A. They were all deleted automatically. That's the default setting in Signal.

Q. And you don't think that you ever spoke to them on any other service beyond Signal, including Nate, for instance?

A. No

Q. The Signal platform, can you tell me a little bit about it. You mentioned auto delete, can you explain what you mean.

·MS. DOUD: Objection.

A. It's a messaging and calling platform that everybody was using that I downloaded to communicate with Nate, Josh, Anthony.[20]

Chairman Carr has a Signal account. In a previous FOIA request, Chairman Carr's telephone number was disclosed. Exhibit 4 is an email from Fox News confirming an interview Fox scheduled with then Commissioner Carr on a show, The Ingraham Angle. That email contains Carr's unredacted mobile telephone number.[21] Signal accounts are linked to the owner's

---

[20] Ex. 3 Deposition of Justin Fox, pps. 30 -32.

[21] While Carr's phone number was placed in the public record unredacted, to preserve Carr's privacy, Plaintiffs have redacted the phone number from Exs. 4 and 5. At the request of the

telephone number. If the owner of the number has a Signal account, the Signal App will identify the username associated with that number. Entering Carr's previously made public mobile number into the Signal app shows that he has an active Signal account under the username "Brendan Carr." Ex. 5.

The FCC claims that "It is agency policy not to download additional messaging applications on FCC phones (e.g., Signal, WhatsApp)." Decl. ¶ 23, SUMF ¶ 22. The FCC also claims that "it is and was at all relevant times, agency policy not to use personal phones to conduct government business." Motion, p. 14. See also, Ex. 6, "Federal Communications Commission Information Technology and Privacy Rules of Behavior." Plaintiffs do not know whether the number identified in Exs. 4 and 5 belongs to Carr's personal phone or a government issued phone. What we do know is that a phone is being used for government business and that it has a Signal account in Carr's name. Based on information and belief Carr regularly conducts government business through text and Signal messages, communicating with journalists, industry professional and individuals who work for regulated entities, such as Musk and SpaceX.

The Defendant claims that Carr did not have the phone numbers of the imbedded DOGE personnel. Decl. ¶ 21. But this is hardly responsive to Plaintiffs' FOIA request. It is unlikely that Carr would have communicated with individuals at that level. Carr would have communicated with Musk or other highly placed DOGE officials. Did the FCC determine if Carr or his Chief of Staff have the phone numbers or were otherwise in communication with other DOGE personnel? It did not. Did the FCC search for text messages or Signal chats between DOGE personnel and the four appointed internal DOGE team members? Except for Adam Candeub, it did not. The

_____

Defendant or the Court, Plaintiffs will provide the unredacted exhibits or file them with the Court.

Defendant claims it contacted Adam Candeub who stated that there were no text messages. Decl. ¶ 31. Did it seek to determine if Candeub communicated with DOGE personnel via Signal? It did not.

The FCC's Statement of Undisputed Material Facts and Declaration, while perhaps falling short of a direct misrepresentation to the Court, demonstrates a stunning lack of candor. The FCC states that it does not permit apps such a Signal on government phones and forbids the use of personal phones for government business and then fails to disclose that Carr has a mobile phone that he uses for government business, and on which he has loaded the Signal app. This begs the question; how many other top FCC officials are following Carr's lead and communicating via Signal and/or text? Since Carr has the Signal app on his phone, it follows that other FCC staffers are encouraged to use text and Signal communications to conceal their government activities.

### c. Despite Plaintiffs Objections, the FCC Limited Its Search to Emails with FCC, DOGE and GSA domains.

The FCC, despite Plaintiffs clearly worded FOIA request, decided to limit its search to emails to Greg Watson, Scott Delacourt, Adam Candeub, and Allen Hill received from the following email address or domains, tarak.makecha@fcc.gov, jordan.wick@fcc.gov, jacob.altik@fcc.gov and emails with domains ending in doge.eop.gov, doge.gov, usds.gov. SUMF ¶23, Decl. ¶ 24.[22] Plaintiffs in their June 19, 2025, letter to Defendant's attorney specifically rejected this approach as unworkable. (Ex. 1. See, discussion of letter, *supra*.). The FCC has not represented that DOGE members exclusively used doge.gov or any other government domains when communicating with the FCC.

---

[22] SUMF at ¶ 25 the FCC acknowledges that it later searched the email addresses of Makecha and Wick at other federal agencies at which they worked.

The FCC acknowledges that it later searched the email addresses of Makecha and Wick at other federal agencies at which they worked. SUMF at ¶ 25 However, at best that search was incomplete and inadequate. For example, in response to another FOIA request, the FCC produced emails sent to jordan.wick@gsa.gov from Scott Delacourt. Ex. 7. The emails in exhibit 7 were not produced in response to Plaintiffs FOIA request. The FCC claims that it searched for emails to Greg Watson, Scott Delacourt, Adam Candeub, and Allen Hill from jordan.wick@gsa.gov. However, apparently it did not search for emails sent from these individuals sent to jordan.wick@gsa.gov. Nor is there any explanation of why the search was limited only to those four individuals. Clearly, the FCC's search was inadequate and conducted in bad faith.

It is well established that DOGE members used their private emails or the Signal app to communicate.[23] In his deposition, Nathan Cavanaugh makes it clear that he primarily used his private email account and Signal messages to conduct government business.

> Q:      So, earlier we talked about some of your communications with Mr. Davis, including the context of you emailing yourself. I think you were saying and then using that email on Signal to send it to Mr. Davis. Do you ever remember talking about that with Mr. Robinson earlier?
>
> A:      I do.
>
> Q:      Okay. Walk me through that process exactly.
>
> A:      There was a weekly score card, as it was called, where we reported on savings across each agency. It was block text in an excel spreadsheet file that was downloaded. Steve preferred that it

---

[23] See video deposition of Nathan Cavanaugh, where he discusses using Signal and his personal email to send government information. https://www.reddit.com/r/FedEmployees/comments/1rrq1cq/doge_lead_in_deposition_details_how_he_emailed/ An official transcript of this part of the deposition is not available in the court records. Plaintiffs have transcribed that portion of the deposition, and it is attached hereto as Ex. 8.

> be sent over Signal. Signal is not on a government device, so we downloaded it and sent it to Steve on Signal. That was the extent of it.
>
> . . .
>
> Q:    Okay. Have you ever … do you know whether Mr. Davis had a government email?
>
> A:    I believe he had an EOP email address that he did not use.
>
> . . .
>
> Q:    Okay. But you then sidestep that by sending documents to your personal phone so that you can then use Signal.
>
> A:    Absolutely. For the weekly score card, that was the process, yes.

Using personal emails and communicating through Signal was standard practice at DOGE. Yet, did the FCC search for personal emails DOGE employees used to communicate with the agency? It did not. It did just the opposite, it did everything it could to obfuscate what it knew to be standard operating procedure.

### d. The Travel Documents Provided by the Commission Contain Nothing Related to Starlink.

The Plaintiff's FOIA requested, "All documents from January 1, 2021, to the present, relating to travel by Brendan Carr or the Carr Office to any location or facility of any Elon Musk Affiliated Entity." ECF No. 1 at 12–18. This specifically included travel documents related to trips involving Starlink. The FCC's April 30, 2026, production of travel documents contains several repetitive airline ticket receipts, hotel and rental car booking, and two basic itineraries provided by SpaceX for public launches. But neither the April 30, 2026, production nor any earlier productions provided any itineraries or any other substantive documents for travel specifically related to Starlink.

For example, a June 4, 2021, email from Gregory Watson to then-Commissioner Carr notes a trip to a "SpaceX/starlink manufacturing facility" in the Seattle, Washington area[24] on or about June 30, 2021, but no itinerary, briefing materials, or any further information regarding the visit is provided. However, on June 30, 2021, then-Commissioner Carr made a post on the social media platform then called Twitter (now "X") stating: "Beaming high-speed Internet from space. The @SpaceX team here in Redmond, Washington manufactures the thousands of next-gen satellites that are helping to expand connectivity. #CarrTrip."[25]

It is simply inexplicable that no formal itinerary or briefing documents were created for this visit. Starlink had been tentatively awarded a broadband subsidy as part of the Commission's Rural Development Opportunity Fund (RDOF) reverse auction (Auction 904).[26] By April and May 2021, however, staff from the Commission's Wireline Competition Bureau (WCB) had notified Starlink staff "about the numerous financial and technical deficiencies the Bureau had identified in Starlink's application."[27] In response, Starlink provided a number of responses to the Commission. On August 10, 2022, WCB terminated Starlink's application for RDOF funding after finding that is had not met its burden to provide broadband service under the terms of the RDOF program. This decision was upheld by the full Commission in December 2023. And then-Commissioner Carr even noted in his dissenting statement to the denial that Starlink attempted to bolster its case to receive RDOF funding through "a voluminous series of

---

[24] Ex. 2. Bates 004095.

[25] https://x.com/BrendanCarrFCC/status/1410381256714461190?s=20

[26] *In re FCC Reaffirms Decision to Reject Starlink Application for Nearly $900 Million in Subsidies*, 38 FCC Rcd 1220, 12205 (2023).

[27] *Id.*

submissions that it filed with the FCC throughout 2021 and 2022."[28] But the materials provided to the Plaintiffs provide nothing on this critical back-and-forth that appears to be the impetus for then Commissioner Carr's June 30, 2021, visit to the Starlink facility.

This is also the case for a visit then-Commissioner Carr made to a Starlink facility in Redmond, Washington on or about June 30 to July 2, 2024. On July 3, then-Commissioner Carr sent a "Tweet" that: "Great to meet with the talented @Starlink and @SpaceX teams in Redmond, Washington recently.[29] Beaming high-speed Internet across the globe from low earth orbit satellites is a game changer for connectivity. #CarrTrip." But the only documentation provided for this trip is an airline ticket voucher.[30] No other background or briefing materials were provided to Plaintiffs even though then-Commissioner Carr's Tweet indicates that it was a substantive visit with a discussion of Starlink's pending FCC equities.

## ARGUMENT

FOIA was enacted to provide a statutory right to public access to documents and records held by agencies of the federal government.[31] As such, FOIA embodies a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.[32] "Government transparency is critical to maintaining a functional democratic polity, where the people have the information needed to check public corruption, hold government

---

[28] *Id.* at 12214, Dissenting Statement of Commissioner Brandan Carr. See also Kang, Cecilia, *Admirer at F.C.C. Smooths Way for Musk*, N.Y. Times, (June 10, 2026), , *available at* https://www.nytimes.com/2026/06/08/technology/elon-musk-brendan-carr-fcc-spacex.html.

[29] https://x.com/BrendanCarrFCC/status/1808515912871403718?s=20

[30] See Ex. 2 Bates 3883-3885.

[31] *Pratt v. Webster*, 218 U.S. App. D.C. 17, 673 F.2d 408, 413 (D.C. Cir. 1982).

[32] *Id.* See also *Dep't of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Assn.*, 532 U.S. 1, 7-8, 121 S. Ct. 1060, 149 L. Ed. 2d 87 (2001) (noting that the basic objective of FOIA is disclosure, not secrecy).

leaders accountable, and elect leaders who will carry out their preferred policies. Consequently, FOIA was enacted to facilitate public access to [g]overnment documents by establish[ing] a judicially enforceable right to secure [government] information from possibly unwilling official hands."[33]

Challenges to an agency's FOIA responses typically are decided on motions for summary judgment. See, *Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527, 395 U.S. App. D.C. 155 (D.C. Cir. 2011). Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See id.; *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular . . . materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for

---

[33] *Transgender Law Ctr. v. Immigration & Customs Enf't*, 46 F.4th 771, 779 (9th Cir. 2022) citing *Hamdan v. United States DOJ*, 797 F.3d 759, 769-70 (9th Cir. 2015).

nondisclosure with reasonably specific detail, . . . and are not controverted by either contrary evidence in the record []or by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862, 385 U.S. App. D.C. 394 (D.C. Cir. 2009) (citation omitted). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

Courts apply a two-step framework to evaluate the adequacy of an agency's FOIA search. First, the agency must show that its search was reasonable, meaning it "made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Watkins L. & Advoc., PLLC v. DOJ*, 78 F.4th 436, 442, 463 U.S. App. D.C. 1 (D.C. Cir. 2023). Agencies "submit declarations that denote which files were searched and by whom those files were searched" and must prove they took a reasonable "systematic approach to document location." *Heartland All. for Hum. Needs & Hum. Rts. v. USCIS*, 406 F. Supp. 3d 90, 110 (D.D.C. 2019). If the agency carries its burden of showing reasonableness, at step two, "the burden shifts to the FOIA requester to produce countervailing evidence suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Id.* The requester must "rebut" the agency's showing of reasonableness with any "evidence . . . showing that the search was not conducted in good faith." *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996). See also, *Heritage Found. v. DOJ*, 743 F. Supp. 3d 29, 35 (D.D.C. 2024).

19

FOIA was designed to provide public access to documents especially where government officials are unwilling to provide those documents. As discussed, DOGE operates under a high degree of secrecy. It has been repeatedly demonstrated that DOGE and agencies cooperating with DOGE routinely concealed or destroyed relevant government information. DOGE officials, such as Justin Fox and Nathan Cavanaugh, used Signal and private emails to communicate. Brendan Carr has uploaded the Signal app on a mobile phone he apparently uses to conduct government business. In its Motion, the FCC stated that it is agency policy not to download additional messaging applications such as Signal on FCC phones. Decl. ¶ 23, SUMF ¶ 22. Yet, it failed to disclose that the Chairman of the FCC uses the Signal app. It appears that the FCC intentionally withheld this information to avoid Court scrutiny. Nor has the FCC disclosed whether other members of the FCC staff use Signal to conduct government business. The FCC has stated its policy, while avoiding any mention of FCC officials' actual practices.

The Defendant has repeatedly sought to delay document production. As discussed herein, the FCC instead of negotiating with Plaintiffs or seeking an order from the Court, decided on its own to adopt incomplete search criteria. The point of FOIA is to get the government to disclose documents it might not want in the public domain. Instead of negotiating with Plaintiffs or seeking an order from the Court, the FCC simply decide to search where it knew it would not find any meaningful documents. The FCC did not inquire of its bureau chiefs to search for any responsive documents. Nor did it ask the offices of the Commissioners. No effort was made to search emails, texts or other private communications. Regarding its employees' use of the Signal app, the FCC simply ignored the request.

The evidence clearly demonstrates that the FCC has acted in bad faith by withholding documents responsive to Plaintiffs' FOIA request. The FCC acted in bad faith when it redefined

20

the search criteria without notice to Plaintiffs or this Court. Further, the FCC acted in bad faith by concealing the fact that the Chairman Carr has a Signal account on a phone he uses to conduct government business.

The FCC refashioned Plaintiffs' FOIA request and thus did not conduct an adequate search. It did so deliberately and in bad faith. The Defendant has the burden to demonstrate that its search was reasonably calculated to uncover all relevant documents. The FCC falls far short of that standard. Agencies must demonstrate the adequacy of a search "beyond material doubt" or "beyond a material doubt."[34] Requiring Defendant to meet the "beyond material doubt" standard ensures that the "adequacy of an agency's search for requested documents is judged by a standard of reasonableness."[35] This approach properly places a concrete burden of proof on the government, requiring an agency to show that it has undertaken all reasonable measures to uncover all relevant documents. This standard also gives teeth to the adequacy standard by preventing agencies from blithely asserting adequacy without backing up such an assertion.

The public interest in disclosure of these documents is critical. As discussed, *supra*, the FCC has refused to consider the conflict-of-interest created, on the one hand, by Musk's role as a super contributor to the Republican Party, his role as head of DOGE and, on the other hand, his majority control of SpaceX. Providing a record of Musk's and DOGE's contacts with the FCC could reveal any undue influence to promote Musk's business interests in violation of the law. Plaintiffs have provided convincing evidence that the Defendant's search was inadequate by

---

[34] *See, e.g., Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1248 (11th Cir. 2008); *Morley v. CIA*, 508 F.3d 1108, 1114, 378 U.S. App. D.C. 411 (D.C. Cir. 2007); *Miller v. Dep't of State*, 779 F.2d 1378, 1383 (8th Cir. 1985); *Transgender Law Ctr. v. Immigration & Customs Enf't*, 46 F.4th 771, 779 (9th Cir. 2022).

[35] *Miller*, 779 F.2d at 1383 (citing *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351, 227 U.S. App. D.C. 253 (D.C. Cir. 1983)).

21

design. An agency search is inadequate when the record itself reveals "positive indications of overlooked materials."[36] In this case, the record abounds with instances of overlooked materials.

## CONCLUSION

The FCC has had well over a year and numerous opportunities to respond to Plaintiffs' FOIA request. It has not conducted its search for responsive documents in good faith. Instead, it has sought to delay the production of responsive documents and obfuscate the existence of responsive records. Accordingly, Plaintiffs respectfully asks the Court to deny Defendant's Motion. Plaintiffs further request that the Court order the FCC preserve all records that may be responsive to Plaintiffs' FOIA request; that the Court Order Defendant to produce all responsive documents within 7 days of the date of the court's order; and that the court permit Plaintiffs to file Discovery Requests withing 14 days after Defendant produces responsive documents. The FCC has made it clear that it will not undertake a good faith effort to produce responsive documents. Accordingly, discovery is required and will speed the document production process by helping the Plaintiffs identify responsive documents.

By:    /s/ Arthur Belendiuk
Arthur V. Belendiuk
D.C. Bar No. 336768
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W., #301
Washington, D.C. 20016
(202) 363-4559

Dated: June 25, 2026

---

[36] *Valencia-Lucena v. United States Coast Guard*, 336 U.S. App. D.C. 386, 180 F.3d 321, 327 (1999).

22